**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

|  |  |  |
|---|---|---|
| SOURCE SEARCH TECHNOLOGIES, LLC, | : | Civil No. 11-3388 (FSH) |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | **OPINION** |
|  | : |  |
| KAYAK SOFTWARE CORP., | : |  |
|  | : |  |
| Defendant. | : | January 27, 2014 |
|  | : |  |

---

**HOCHBERG, District Judge:**

This case comes before the Court on a request for claim construction from Plaintiff Source Search Technologies, LLC, ("SST" or "Plaintiff") together with Defendant Kayak Software Corp. ("Kayak" or "Defendant"). The parties submitted their Joint Claim Construction and Prehearing Statement on August 7, 2013. On September 13, 2013, the parties filed their opening claim construction briefs, and on October 14, 2013, they filed their responsive briefs. The parties filed an amended Joint Claim Construction and Prehearing Statement on October 18, 2013 and again on November 22, 2013. A claim construction hearing took place on December 4, 2013. Because the parties had difficulty with the audiovisual system and were not able to designate those portions of the extremely lengthy appendix which supported their respective positions, the Court ordered that the parties designate those portions of the appendix on which they relied.

Following that hearing, the parties filed an amended claim construction chart on January 10, 2014.[1]  Where the parties changed their proposed constructions in later filings, the Court considers any prior proposed constructions abandoned and waived.

## I. FACTS

SST brings this action alleging infringement of U.S. Patent No. 5,758,328 ("the '328 patent") by Kayak.  The parties ask the Court to construe 10 claim terms found in a number of claims of the '328 patent.  The '328 patent is titled "Computerized Quotation System and Method."  Joseph Giovannoli filed the patent application that would later issue as the '328 patent on February 22, 1996.  The '328 patent issued May 26, 1998.  On August 11, 2011, there was a reexamination request for the '328 patent.  The reexamination certificate for the patent issued March 21, 2013.  During reexamination, several of the '328 patent's claims were cancelled, added, or modified.  The '328 patent describes a computerized system for processing requests for quotations ("RFQs") between buyers and sellers over a network.  SST alleges that Kayak infringes claims 4-7, 10-12, 14-16, and 20 of the '328 patent.  Claims 4, 12, and 20 are independent claims.

The '328 patent has been previously litigated.  In *Source Search Technologies, LLC v. Lending Tree, LLC*, Civ. No. 04-4420, 2006 WL 2990363 (D.N.J. Oct. 16, 2006), the Honorable Dickinson R. Debevoise, U.S.S.D.J., construed many of the terms found in the '328 patent, but only two of the claim terms addressed in the *Lending Tree* claim construction ruling are at issue in this case.  The *Lending Tree* Court also issued a summary judgment ruling finding that the Lending Tree website infringed the '328 patent, that the '328 patent was invalid due to

---

[1] The parties initially briefed two additional claim terms found in claim 7 of the '328 patent, but the parties have dropped those terms from their most recent filing.  (*Compare* Dkt. No. 110 *with* Dkt. No. 123.)  Because the parties have dropped those terms, the Court will not address them in this Opinion.

obviousness, and that the '328 patent was not invalid due to indefiniteness due to the phrase "goods or services." On appeal, the Federal Circuit reversed the district court's grant of summary judgment with respect to infringement and invalidity, finding that there were facts in dispute. The Federal Circuit affirmed the district court's finding that the phrase "goods or services" was not indefinite, and remanded. *Source Search Technologies, LLC v. LendingTree, LLC*, 588 F.3d 1063, 1077 (Fed. Cir. 2009).[2] The parties subsequently settled.

The relevant claims are reproduced below and the disputed terms are underlined and bolded.[3]

### Claim 4

A computerized system for engaging in transactions over a data network, said computerized system comprising:
a central database;
a plurality of terminals, at least one of which being designated a requestor and others of which are designated vendor terminals;
**filter and broadcast means for receiving, over said data network, requests from said requestor to engage in transactions with unspecified vendor terminals, and for filtering said requests to determine with which vendor terminals said requests should be matched**; and
**means for matching said requests with vendor terminals which meet predetermined filter conditions for generating quotes from information contained in a database associated with said vendor terminals, and for accepting said quotes from said vendor terminals**, wherein the central database contains information that is insufficient to consummate the transaction.

### Claim 5

The computerized system of claim 4 further comprising **means for communicating responses from said vendor terminals to said filter and broadcast means**; and

---

[2] The appeal to the Federal Circuit in *Lending Tree* occurred prior to the '328 patent's reexamination. In *Lending Tree*, the patentee initially asserted original claims 1-7 and 11-14, but the appeal to the Federal Circuit only involved original claim 14, a claim that depended on original claims 12 and 13. On appeal, the Federal Circuit did not address any of the claim terms discussed below.

[3] Later claims that merely repeat disputed claim terms are not included.

**means at said filter and broadcast means for communicating a selected set of said responses to said requestor**.

### Claim 11

The apparatus of claim 4 wherein further comprising **means for automatically notifying** a buyer when particular items meeting specified conditions become available from a seller.

### Claim 12

A method of purchasing goods or services over a data network comprising the steps of:

communicating, over said data network, to a filter means, at least one request for a quotation from a potential buyer of said goods or services;

**filtering, at said filter means, the at least one request for quotation in order to ascertain a set of sellers potentially capable of supplying said goods or services**; and

**obtaining**, from at least one of said potential sellers previously ascertained by said filtering said request for quotation, over a data network, **quotes** to supply said goods or services, and forwarding said quotes to said potential buyer, wherein at least part of the quote information is stored at a location remote from said filter means.

## II. LEGAL STANDARD

In a patent infringement analysis, the first step is to define the meaning and scope of the claims of the patent. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). The construction of patent claims is a matter of law reserved exclusively for the court. *Markman*, 52 F.3d at 977-79. There are two categories of evidence available to the Court when construing patent claims: (i) intrinsic evidence; and (ii) extrinsic evidence, such as expert testimony.[4] "When construing a claim, a court principally consults the evidence intrinsic to the patent, including the claims, the written description and any relevant prosecution history." *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1371 (Fed. Cir. 1998); *see also Markman*, 52 F.3d at 979 ("To ascertain the meaning of claims, we consider three sources: the claims, the specifications, and the prosecution history").

---

[4] The use of extrinsic evidence is limited in purpose and scope.

The court's analysis must begin with the language of the claims themselves, "for it is that language that the patentee chose to use to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2). Claims are "examined through the viewing glass of a person skilled in the art" as of the effective date of the patent, and claim terms are deemed to be read "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). When a patentee specifically defines a claim term in the specification, it is that definition that controls. *Id*. at 1316. When the patentee has not provided an explicit definition of a claim term, the words of a claim are given their plain and ordinary meaning to a person of ordinary skill in the art. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

To determine how a person of skill in the art would understand a patent's claim language, a court must first examine the intrinsic record, *i.e.*, the patent itself, including the claims, the specification and the prosecution history. *Id*. (citing *Markman*, 52 F.3d at 979). The specification "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id*. The Federal Circuit has explained that the specification is "usually . . . dispositive . . . [and is the] best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics*, 90 F.3d at 1582) (internal quotations omitted). Therefore, a court should "rely heavily on the written description for guidance as to the meaning of the claims." *Id*. at 1317.

A patent's prosecution history is another useful source of guidance, as it "provides evidence of how the PTO and the inventor understood the patent." *Id*. The prosecution history

is the complete record of the proceedings before the USPTO, and "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id*. The Federal Circuit has made clear the need to consult the prosecution history to "exclude any interpretation that was disclaimed during prosecution." *See Rhodia Chimie v. PPG Indus.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (the prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was either disclaimed or disavowed during prosecution).

If the ambiguities of a disputed claim term have not been resolved after analysis of the intrinsic evidence, a court may also consider extrinsic evidence. *Vitronics*, 90 F.3d at 1582-83. While a court may rely on extrinsic evidence to construe a claim, "what matters is for the court to attach the appropriate weight to be assigned to those sources." *Phillips*, 415 F.3d at 1324. Extrinsic evidence ordinarily should not contradict intrinsic evidence. *Id*. at 1322-23.

Many of the disputed claim terms are written in a means-plus-function format under 35 U.S.C. § 112(f).[5] Section 112(f) states:

> Element in Claim for a Combination.— An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112(f). "Construction of a means-plus-function limitation includes two steps. First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent that performs the function." *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012). "A structure disclosed in the specification qualifies as a 'corresponding structure' if the specification or the prosecution

---

[5] Section 112(f) was previously known as § 112, ¶ 6.

history 'clearly links or associates that structure to the function recited in the claim.'" *Id.* "This duty to link or associate structure to function is the *quid pro quo* for the convenience of employing § 112, ¶ 6." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). "[A] means-plus-function claim limitation is limited to the structures disclosed in the specification and equivalents." *Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291, 1296 (Fed. Cir. 2012). "If a patentee chooses to disclose a single embodiment, then any means-plus-function claim limitation will be limited to the single disclosed structure and equivalents thereof." *Id.*

"Means-plus-function claim limitations must satisfy the requirements of § 112 ¶ 2."[6] *Noah Sys.*, 675 F.3d at 1311. "Under 35 U.S.C. § 112 ¶ 2 and ¶ 6 . . . 'a means-plus-function clause is indefinite if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim.'" *Id.* "While it is undisputed that the question of whether a claim is indefinite is based on how the claim limitation would be understood by one of skill in the art, the testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification." *Id.* (internal citations and quotation marks omitted). "The prohibition against using expert testimony in this manner is a direct consequence of the requirement that the specification itself adequately disclose the corresponding structure." *Id.* "If an applicant does not disclose structure for a

---

[6] Section 112, ¶ 2 was recently renamed § 112(b). Section 112(b) states:

> Conclusion.— The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.

35 U.S.C. § 112(b).

means-plus-function term, the claim is indefinite." *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1363 (Fed. Cir. 2012).

In cases involving a special purpose computer-implemented means-plus-function limitation, the Federal Circuit "has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." *Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Instead, the specification must disclose an algorithm. *Id.* at 1337-38. The specification can express the algorithm "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure."[7] *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (internal citation omitted). But simply disclosing software "without providing some detail about the means to accomplish the function is not enough." *Id.* at 1340-41.

## III. DISCUSSION

As a preliminary matter, the parties agree to the following constructions (Dkt. No. 91):

- "request for quote" means "a request for the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance";

- "quote" means "the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance"; and

- "filter conditions" means "limitations or conditions included in the RFQ and/or in the response" or by the network "that determine which of the network vendors will receive a buyer's request for quotation and/or which buyers will receive a

---

[7] There are two lines of cases governing special purpose computer-implemented means-plus-function claims. The first addresses instances where the specification discloses no algorithm. *E.g.*, *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1383-85 (Fed. Cir. 2009). The second addresses instances where the specification discloses an algorithm but there is a dispute over whether the disclosure is adequate. *E.g.*, *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). The sufficiency of the disclosure of an algorithmic structure is judged in light of what one of ordinary skill in the art would understand, but it is not enough to merely state that a person of ordinary skill in the art would know the structures that could be used to accomplish the stated function. *Aristocrat*, 521 F.3d at 1337.

response from a network vendor."  Filter conditions can include a product or product information.

As the parties agree to these constructions, the Court adopts them as the constructions for this matter.  The disputed claims are addressed below.

**a.  "filter and broadcast means for receiving, over said data network, requests from said requestor to engage in transactions with unspecified vendor terminals, and for filtering said requests to determine with which vendor terminals said requests should be matched"**

"Filter and broadcast means . . ." is a means-plus-function claim term.  Therefore, the Court must first determine the claim's function and then identify the corresponding structure in the written description of the patent.  *Noah Sys.*, 675 F.3d at 1311.  The Court will address this phrase in two parts:  (1) the "filter means" and (2) the "broadcast means."

  **i.  *"filter . . . means"*[8]**

The parties agree that this term is a means-plus-function limitation that is implemented by special-purpose computer.  (Dkt. No. 110 at 3.)  Therefore, the specification must include structure in the form of an algorithm.[9]  *Aristocrat Techs.*, 521 F.3d at 1333.

Plaintiff argues that the Court should adopt the claim construction from the *Lending Tree* litigation.  The *Lending Tree* Court found that the function for the term "filter . . . means" in claim 4 is "i) 'receiving, over said data network, requests to engage in transactions with unspecified vendor terminals' and ii) 'filtering said requests to determine with which vendor terminals said requests should be matched.'"  *Lending Tree*, 2006 WL 2990363 at *10.  The *Lending Tree* Court discussed various structures it found corresponded to the recited function within the specification.  *Id.* at *12 (discussing the '328 patent at Fig. 2A, Fig. 3, Fig. 5, Fig. 6,

_____

[8] This includes "filtering, at said filtering means" from claims 12 and 20.

[9] An algorithm is simply a step-by-step procedure.  As noted above, there is no particular or required format for algorithms under § 112(f).  Rather, the algorithm can be in the form of prose, a flow chart, a formula, or any other form that would provide sufficient structure.

7:2-3). It concluded by finding that "filter means" meant "[a] computer programmed to apply or compare specified conditions to an item(s) of information to determine if the condition is met or not by the item(s) of information." *Id*. Plaintiff also points to other sections of the '328 patent to support its alleged structures. (*E.g.*, '328 patent at 5:9-36, 7:1-46.)

Defendant argues that "filter . . . means" has the function of "filtering the requests for quote to determine which vendor terminals the requests for quote should be matched." Defendant argues that the corresponding structure for this limitation is the algorithm found in Figures 5 and 6 of the '328 patent. (Dkt. No. 110 at 3.) Defendant also argues that this construction is supported by the prosecution history where SST distinguished the prior art by stating "none of [the prior art] systems includes a centralized filter and broadcast means which first filters the RFQ to obtain a small subset of potential vendors and then matches the RFQ with these potential vendors so that quotes are supplied to the buyer." (JA 81.)[10] Defendant argues that the algorithm in Figures 5 and 6 accomplishes the goal of obtaining a "small subset" of vendors. Defendant argues that the reexamination prosecution history confirms that Figures 5 and 6 are the sole structure for the "filter means." (*E.g.*, JA 1663, JA 1660, JA 1304.)

The Court finds the function of "filter means" is "filtering the requests for quotation to determine which vendor terminals the requests for quotation should be matched." This function is essentially agreed upon by the parties and is further supported by the *Markman* opinion in *Lending Tree*. It is also supported by the text of the asserted claims that incorporate a "filer means." (*See* '328 patent at claims 4, 12, and 20.)

The corresponding structure for this limitation may be found in several places in the '328 patent. For example, Figure 2A discloses the following algorithm as a "filter means": "The

---

[10] "JA" refers to the joint appendix submitted by the parties.

Quotation System Processes the Request by [1] Selecting a Class of Vendors Who Sell the Requested Product(s) and [2] Meet the Filter Requirements of the Buyer, Vendor, and the Quotation System." ('328 patent at Fig. 2A (numbering added).) Figure 3 gives the example of an additional filter criterion of "vendor specified area." (*Id*. at Fig. 3.) Figures 5 and 6 also provide the structure for the "filter means" function. (*Id*. at Figs. 5, 6.) The patent goes on to describe how this filtering process can occur. (*Id*. at 5:9-36.) For example, "[t]he buyer and vendor filters may represent in their simplest form defined classes of suppliers and/or buyers and may extend to delineate conditions of sale and/or purchase." (*Id*. at 5:15-18.) From these disclosures, the Court deviates slightly from the *Lending Tree Markman* Opinion in the prior district court action. This Court finds that the disclosed algorithm requires at least the following steps: (1) selecting a class of vendors who sell the requested item(s), and (2) applying or comparing specified conditions to an item(s) of information to determine if the condition is met or not by the item(s) of information.[11]

Defendant argues that this function and structure must be limited to "a small subset" of potential vendors. (Def.'s Opening Br. at 15.) But the phrase "small subset" does not appear in the claims of the '328 patent. Moreover, the prosecution history Defendant cites in support of this proposition merely states the intended consequence of applying the "filter means." Defendant's suggested structure illustrates the point. Defendant argues that there needs to be a "small subset" of potential vendor terminals—it argues that Figures 5 and 6 are the exclusive

---

[11] Once the Court determines there is some structure disclosed in the patent, the sufficiency of the disclosure is then evaluated in light of what one of ordinary skill in the art would understand the disclosure to impart. *Aristocrat*, 521 F.3d at 1337; *see also AllVoice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007) ("[A]lgorithms in the specification need only disclose adequate defining structure to render the bounds of the claim understandable to one of ordinary skill in the art.").

means of obtaining the resulting subset. But as explained above, the patent discloses other structures for filtering the requests from the requestors.

Defendant also argues that the prosecution history demonstrates that Plaintiff limited itself to Figures 5 and 6 as the structure for "filter means." However, none of the sections of the prosecution history Defendant relies on explicitly restrict the disclosed structure for "filter means" to Figures 5 and 6. Rather, the communications with the USPTO show that Figures 5 and 6 were cited as examples of such structures. (*E.g.*, JA 1663 ("The disclosure of this means plus function language in claim 4 includes, ***inter alia***, the flow charts and algorithms of Figures 5 and 6 of the '328 patent." (emphasis added)), JA 1304 ("Moreover, the filter means recited in claim 12, which serves to 'ascertain a set of sellers potentially capable of supplying said goods or services' is described ***at least*** at Figures 5 and 6." (emphasis added)).) This is not the clear and unambiguous disavowal that is required to limit claim scope. *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1322 (Fed. Cir. 2012). The proposed construction is also supported by the fact that the patent itself refers to Figures 5 and 6 as "sample logic." ('328 patent at 5:29-33.)

### ii. "broadcast means"

Plaintiff argues that the Court should adopt the claim construction for "broadcast means" found in the *Lending Tree* Opinion. The *Lending Tree* Court found that the function for the term "broadcast means" in claim 4 is "receiving, over said data network, requests from said requestor." *Lending Tree*, 2006 WL 2990363 at *13. The *Lending Tree* Court found that the corresponding structure was "use of Internet HTML pages (Col.4, ll.1-9), a menu function for permitting users to enter RFQ information to be conveyed to the central computer (Col 4, ll. 12-26), Figure 5's depiction of a flow chart programmed to get the RFQ from the network (See top of Figure 5, 'Get RFQ')." *Id*. Plaintiff argues that the construction for "broadcast means" is intertwined with and applicable to the following additional term: "means for communicating."

Plaintiff argues that these terms address communications among buyers, sellers, and a central computer and, therefore, are entitled to the same claim construction.

Defendant argues that the function of "broadcast means" is "receiving, over the data network, requests from the requestor to engage in transactions with unspecified vendor terminals." Defendant argues that the corresponding structure for this limitation is the use of file transfer protocol (FTP). ('328 patent at 4:67-5:8.) In response to Plaintiff's proposed structures, Defendant argues that those structures are not linked to receiving requests from requestors, rather, they are ways of creating the RFQs themselves. In its revised filing (Dkt. No. 110), Plaintiff essentially adopts Defendant's definition for the function of this term. (*Id.* at 2.)

The parties agree that this term is a means-plus-function limitation. (*Id.*) But the parties disagree as to whether this limitation is implemented by a special purpose computer (and therefore must have an algorithm disclosed in the specification). (*Id.*) As a threshold matter, the Court finds that the "broadcast means" from claim 4 is software that must be implemented by a special-purpose computer. Thus, there must be structure, in the form of an algorithm, disclosed in the patent's specification.

The Court finds that the function of this term is "receiving, over the data network, requests from the requestor to engage in transactions with unspecified vendor terminals." This function is supported by the language of claim 4. The structure of this term was discussed in detail by the *Lending Tree* Court. *Lending Tree*, 2006 WL 2990363 at *13. This structure includes the use of Internet HTML pages ('328 patent at 4:1-9), a menu function for permitting users to enter RFQ information to be conveyed to the central computer ('328 patent at 4:12-26), and downloading requests for quotation through a file transfer protocol (FTP) ('328 patent at 5:3-

8).[12]  Defendant argues that there is a distinction between creating an RFQ and receiving a request from a requestor.  It argues that the only disclosure for receiving such data is through FTP.  But the specification of the '328 patent discloses the use of HTML and menus for the submission of RFQs.  Moreover, the depiction of the system found in Figure 4 of the patent supports the proposed construction as it does not show a "FTP only" system—the "Buyer," or requestor, communicates via the World Wide Web to the "Central Office."  ('328 patent at Fig. 4.)

Plaintiff argues that the structure should also include "telephone, email, or other means." (Pl.'s Opening Br. at 19-20 (citing Fig. 2A, Fig. 4, and 6:6-9).)  In its more recent filings, Plaintiff expands this list to "[t]he Internet or other computer communications network."  (Dkt. No. 110 at 2; Dkt. No. 123 at 2.)  But the lower portion of Figure 2A addresses how the quotation system makes the requests from the requestors available **to** the selected vendors, the lower portion of Figure 4 shows how processed responses from vendors are sent via email **to** the buyer, and 6:6-9 addresses how quotations are sent **to** buyers.  These citations do not provide structure for receiving requests **from** requestors to the central computer.  Nor can the structure be a generic computer communications network as Plaintiff suggests.[13]  The function of this limitation is "receiving, **over the data network**, requests from the requestor to engage in transactions with unspecified vendor terminals."  The function occurs over a data network; it is

---

[12] Figure 5 is not included as structure for this limitation as it fails to provide any structure other than a purely functional label (*i.e.*, "GET RFQ").  This label is exactly the function that requires a corresponding structure, yet it adds no structure to the claim.  It is nothing but a black box that represents a function.  *See Blackboard*, 574 F.3d at 1383; *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 518-19 (Fed. Cir. 2012).

[13] Plaintiff cites to portions of the claims themselves as support for the proposed structures for this claim element.  (Dkt. No. 110 at 2.)  Section 112(f) requires that the corresponding structure be disclosed in the ***specification***; these citations to the ***claims*** do not support Plaintiff's position. 35 U.S.C. § 112(f).

not the data network itself.  The '328 patent makes the same distinction.  ('328 patent at 6:24-29.)

**b.** **"means for matching said requests with vendor terminals which meet predetermined filter conditions for generating quotes from information contained in a database associated with said vendor terminals, and for accepting said quotes from said vendor terminals"**

The Court will address this phrase in three parts.  The parties agree that these claim terms are means-plus-function terms.

*i.* *"means for matching"*

The parties agree that the "means for matching" limitation is a means-plus-function limitation that is implemented by a special-purpose computer and, therefore, requires that an algorithm be disclosed in the specification.  (Dkt. No. 110 at 4.)

Plaintiff contends that the function for the "means for matching" limitation is "matching said requests [RFQs] with vendor terminals which have been determined by the filter means to meet predetermined filter conditions."  (Dkt. No. 110 at 4-5.)  Plaintiff argues that the disclosed structure for this limitation is a computer programmed with the algorithm allegedly described in the '328 patent at 5:38-40.[14]  (Dkt. No. 110 at 4-5.)  That portion of the '328 patent states:

> Once vendors are selected to receive RFQs, the RFQ information may be transmitted to them via FTP over the Internet, however, a preferred way would be to provide vendors with software which permits them to schedule when they wish to communicate with the quotation system.

('328 patent at 5:38-41.)  Plaintiff's claim construction chart quotes a portion of the specification as:  "Once vendors are selected to receive the RFQs [via the filtering], the RFQ information may

---

[14] Plaintiff's prior filings were rather muddled and unclear about which sections of the '328 patent allegedly corresponded to the structures needed for the "means for matching," "means . . . for generating," and "means for accepting" limitations of claim 4.  Plaintiff's revised filings, Dkt. Nos. 110 and 123, restricted its reliance to those portions of the specification addressed herein, and any reliance on other sections of the '328 patent as the structure supporting these claim terms has been superseded and disavowed.

be transmitted to [the selected vendor terminals]." (Dkt. No. 110 at 4-5 (alterations in Plaintiff's filing).) In its latest filing, Plaintiff describes its proposed algorithm as "[a] computer programmed to actually match the previously selected RFQ with one or more vendor terminals (make a correspondence between the two) after the vendor terminals are selected by the filtering." (Dkt. No. 123 at 24.)

Defendant argues the "means for matching" limitation has the function of "matching requests for quotes with vendor terminals that meet predetermined filter conditions." Defendant also argues that there is no clear linkage to any structure for the "means for matching," rendering the term indefinite.

The Court finds that the function for "means for matching" is "matching the requests with vendor terminals which meet predetermined filter conditions." The phrase "means for matching" lacks any disclosed corresponding structure, in the form of an algorithm or otherwise, in the '328 patent's specification. The portion of the specification Plaintiff relies on only describes the transmission of an RFQ via FTP or "provid[ing] vendors with software" so that they can "schedule when they wish to communicate with the quotation system." ('328 patent at 5:37-41.) Indeed, the first part of Plaintiff's alleged algorithm merely states the end-goal of matching, *i.e.*, selecting some of the vendors to receive an RFQ. This portion of the specification does not disclose a structure or algorithm for *matching* the requests with the vendor terminals. It only describes either the transmission of RFQs via FTP or the use of generic software to schedule a communication. Merely restating the desired function or the use of generic software does not provide the necessary structure to satisfy § 112(f) or § 112(b). *Noah Sys.*, 675 F.3d at 1317;

*Blackboard*, 574 F.3d at 1383.  Notably, the specification of the '328 patent does not use the term "matching" at all.[15]  The Court finds that this claim term is indefinite.

ii.   *"means . . . for generating quotes"*

The parties agree that the "means . . . for generating quotes" limitation is a means-plus-function limitation that is implemented by a special-purpose computer and, therefore, requires that an algorithm be disclosed in the specification.  (Dkt. No. 110 at 6.)

Plaintiff contends that the function for the "means . . . for generating quotes" limitation is "generating quotes from information contained in a database associated with said vendor terminals."  (Dkt. No. 110 at 6.)  Plaintiff argues that the corresponding structure and algorithm is a computer programmed with the algorithm at '328 patent at 5:43-48, to wit, "interrogating the vendor associated database, cross referencing to the vendor's inventory, retrieving pricing and other information necessary to respond to the RFQ, and populating a data structure (e.g.; Fig. 7)."  (Dkt. No. 110 at 6.)  The full text of  the '328 patent at 5:43-48 is:  "the quotation system would interrigate [*sic*] the vendor's product database (using suitable software which links or cross references the vendor's inventory to the quotation system product and services lists) and retrieve pricing and other information necessary to respond to the RFQ."  Plaintiff also cites to the '328 patent at 4:38-44 for support.  (Dkt. No. 91 at 4.)  The '328 patent states:

> Vendors would use quotation system supplied software to cross reference their
> inventory to link with product lists used by the quotation system.  When contacted
> the Central Office would acquire via suitable vendor software the RFQ
> information required and available from the vendors [*sic*] product database.  If the

---

[15] Plaintiff cites to portions of the prosecution history as support for its proposed structure.  (Dkt. No. 110 at 4-5 (citing JA 79 and JA 822).)  But JA 79 merely provides a broad description of the general invention and fails to clearly link any algorithm in the specification to the function of this claim limitation as required by the Patent Act.  (JA 79.)  JA 822 is a portion of the request for reexamination that argues certain prior art discloses "matching."  (JA 822.)  This argument by the party requesting reexamination fails to link the claimed function to any structure in the '328 patent.

vendor has prepared information relating to special sales, this information would be transferred to the Central Office at this time.

('328 patent at 4:38-44.)  Plaintiff also cites to Figures 2A, 7, and 8 for support.  (Dkt. No. 110 at 6 ("Figs 7, 8, showing data structure of generated quote, Fig. 2A, bottom box.").)  In its revised filing, Plaintiff modified its proposed algorithm to "[a] computer programmed with software to interrogate a vendor database, retrieve information, and generate a quote."  (Dkt. No. 123 at 34.)

Defendant argues that the "means . . . for generating quotes" limitation has the function of "[g]enerating quotes from information contained in a database associated with the vendor terminals."  Defendant argues that the "means . . . for generating" limitation is indefinite because it lacks a corresponding structure in the patent.  Specifically, Defendant argues there is no disclosed algorithm, software programming, or logic that generates a quote or the quote specifics.

The Court finds that the function of "means . . . for generating quotes" is "generating quotes from information contained in a database associated with the vendor terminals."  The Court also finds that the phrase "means . . . for generating quotes" lacks any disclosed corresponding structure, in the form of an algorithm, in the '328 patent's specification.

First, the patent merely describes the fact that the vendor should supply "suitable software" that performs the "means . . . for generating quotes" function.  This is not enough disclosure.  *See Aristocrat*, 521 F.3d at 1334 (referencing "appropriate programming" failed to meet the requirements of § 112(f)); *see also Finisar*, 523 F.3d at 1340-41 ("Simply reciting 'software' without providing some detail about the means to accomplish the function is not enough.").  Indeed, there must be an algorithm disclosed for there to be sufficient structure in a specialized computer means-plus-function claim.  Here, the patent only teaches that "suitable software" should be used.  ('328 patent at 5:37-48 ("a preferred way would be ***to provide***

***vendors with software*** which permits them to schedule when they wish to communicate with the quotation system. In this case, the vendor software would contact the quotation system over the Internet via FTP; the quotation system would interrigate [*sic*] the vendor's product database (***using suitable software*** which links or cross references the vendor's inventory to the quotation system product and services lists)"); *id*. at 4:38-44 ("When contacted the Central Office would acquire via ***suitable vendor software*** the RFQ information required and available from the vendors product database.").)

Plaintiff's reliance on Figures 7 and 8 for structure is also misplaced as these figures are merely examples of a completed RFQ—not the steps necessary to achieve such a quotation. (*Id*. at Figs. 7 & 8, 3:44-52 ("Fig. 7 shows a hypothetical list of options for use in preparing requests for quotation to be routed over the network. It is one embodiment of data structures suitable for buyers and vendors to interact via the quotation system network of this invention; Fig. 8 shows a hypothetical illustration of a request for quotation.").) Similarly, Figure 2A fails to provide any meaningful structure or algorithm. It merely states that some "software provided by the quotation system" receives and responds to the RFQs. ('328 patent at Fig. 2A.) The patent fails to supply a clearly linked structure or algorithm for this element. Therefore, the term is indefinite.[16]

Plaintiff argues that the specification discloses the following algorithm for a "means . . . for generating quotes": (1) "interrogate the vendor database," (2) "link or cross reference to the vendor inventory list," (3) "retrieve pricing and other information necessary to complete the quote," and (4) "populate the data structure such as that specifically shown in figure 7." (Pl.'s Opening Br. at 12.) In support of this argument, Plaintiff relies on the declaration of its expert,

---

[16] These portions of the specification do not provide the required "explanation of how the computer performs the claimed function." *Blackboard*, 574 F.3d at 1384.

Dr. Pramod Pancha.[17]  Because Plaintiff's submission of Dr. Pancha's declaration was untimely, it is excluded from this litigation.  (Dkt. Nos. 120 & 121.)

Even if these portions of the specification were linked to the claimed function, Plaintiff's citations omit critical portions of the specification which show there is no algorithm disclosed. As noted above, Plaintiff's proposed steps 1 and 2 are accomplished by "suitable software"—which is the equivalent of no structure at all.  In addition, the specification fails to disclose how the information desired in steps 1 and 2 is actually generated.  Steps 3 and 4 are merely a restatement of the desired function, *i.e.*, generating a quote with the desired information. Plaintiff's reliance on Dr. Pancha does not save this term from a lack of disclosed structure for two reasons.  First, this testimony was excluded as it was untimely and violated the district's local patent rules.  (Dkt. Nos. 120 & 121.)  Second, when there is no structure disclosed, an expert's testimony about what was known in the art does not meet the statutory requirements of § 112(f).

This term is similar to that discussed in *Aristocrat Technologies Australia Pty. Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed. Cir. 2008).  In *Aristocrat*, the Federal Circuit found that the disclosure of "any standard microprocessor base [sic] gaming machine [with] appropriate

---

[17] Dr. Pancha opines that a person of ordinary skill in the art would recognize this disclosure as the "quote generating means" and that "it would be a very simple matter to write a small piece of code to pull the terms desired from the vendor database, assemble them into a data structure and form a quote from it."  (Dkt. No. 84-1.)  Dr. Pancha also opines that the software to perform a database query and pull specified items was well known and in wide use for many years prior to the 1996 filing date of the '328 patent.  (*Id.*)  Notably, this is not exactly what Plaintiff represented to the USPTO.  (*See* JA 1478 n.4 ("To pull the terms of a quote from the vendor database at the 1995 time of the present invention was no small task.  It required a specific software interface to be set up between the central computer and the vendor computers so that the central computer would 'know' what terms of the quote have to be pulled from the vendor database, what format they were stored in, where in the vendor computer to look for them, how to cross reference the vendor's product inventory to find the other terms that go with the quote, etc.").)

programming" failed to meet the requirements of § 112(f).  *Id*. at 1334.  Like *Aristocrat*, the patentee in this case did not disclose an algorithm for a specialized-computer implemented means-plus-function claim.  Instead, the patentee merely stated that "suitable software" could be used to accomplish the claimed function.  This is not enough to satisfy the requirements of § 112.

Plaintiff's reliance on *Typhoon Touch Technologies, Inc. v. Dell, Inc.*, 659 F.3d 1376 (Fed. Cir. 2011) for support is also misplaced.  In *Typhoon*, the patentee disclosed a four-step process for the function of "cross-referencing."  *Id*. at 1385.  The specification disclosed this algorithm in two locations and even used the heading "Cross Referencing" to link the algorithm with the claimed function.  *Id*.  Unlike *Typhoon*, Plaintiff has not linked an algorithm with the claimed function, nor disclosed the actual steps necessary to accomplish the desired function.

Plaintiff relies on several other cases for the proposition that the Court should only find a term indefinite if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim.  For example, Plaintiff cites to *Intel Corp. v. VIA Technologies, Inc.*, 319 F.3d 1357 (Fed. Cir. 2003), *AllVoice Computing PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236 (Fed. Cir. 2007), and *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374 (Fed. Cir. 1999) for this proposition.  *Intel*, *AllVoice*, and *Atmel*, however, all addressed the adequacy of the alleged structure rather than its total absence.  *See Intel*, 319 F.3d at 1365; *AllVoice*, 504 F.3d at 1242, 1245; *Atmel*, 198 F.3d at 1382.  For cases involving a special purpose computer-implemented means-plus-function limitation, the Federal Circuit "require[s] that the specification 'disclose an algorithm for performing the claimed function.'"  *Noah Sys.*, 675 F.3d at 1312.  Here, the lack of such structure renders the claim indefinite, and that void cannot be filled in by a person skilled in the art.

*iii.    "means . . . for accepting"*

The parties agree that the "means . . . for accepting" limitation is a means-plus-function limitation, but disagree whether the limitation is implemented by a special-purpose computer. (Dkt. No. 110 at 7-8.)

Plaintiff argues that the function of this term is "accepting quotes."  (Dkt. No. 91 at 4.) And Plaintiff argues that the structure for the term "means . . . for accepting" is "the storage at the central computer system into which the quotes are received."[18]  (Pl.'s Opening Br. at 25.) Plaintiff specifically points to the temporary storage disclosed for the quotation system computer as the structure that accepts and stores the received quotes.  ('328 patent at 5:45-50, 6:35-40; Dkt. No. 110 at 7 (citing the '328 patent at 5:43-49, 6:36-42).)

Defendant argues that the function for this term is "[a]ccepting the quotes from the vendor terminals."[19]  (Dkt. No. 110 at 7.)  Defendant argues that the "means . . . for accepting" term is indefinite for a lack of corresponding structure, specifically the lack of an algorithm. Defendant argues that Plaintiff never stated that the "means . . . for accepting" was temporary storage during reexamination.  Instead, Defendant argues that Plaintiff limited the patent to "suitable software" and a high level flow chart that fails to disclose an algorithm.

As the parties essentially agree on the function of this limitation, the Court finds that the function of the term "means . . . for accepting" is "accepting the quotes from the vendor terminals."  The parties agree that this function is directed to the acceptance of quotations by the central computer system.  Notably, the specification of the patent does not use the term

---

[18] In its more recent claim construction chart, Plaintiff states that the proposed function is "[a]ccepting (receiving) the quotes from the vendor terminals" and the corresponding structure is "[t]he storage (memory) at the central computer system, in which data (such as quotes) received by the central computer, is stored."  (Dkt. No. 123 at 43.)

[19] Defendant offers the alternative function of "the buyer's ability to accept the quotes from the vendor."  With either function, Defendant argues that the term lacks corresponding structure.

"accepting" when describing the operation of the central computer system. In support of its structure, Plaintiff relies on two portions of the specification. First, Plaintiff cites to a portion of column 5 (Dkt. No. 110 at 7):

> the quotation system would interrigate [sic] the vendor's product database (using suitable software which links or cross references the vendor's inventory to the quotation system product and services lists) and retrieve pricing and other information necessary to respond to the RFQ; and thereafter prepare e-mail to be sent to the requesting buyer member.

('328 patent at 5:43-49.) Plaintiff argues that this portion of the specification describes a system that retrieves information from the vendor and that this information must be accepted at the "Central Office" on memory. (Citing '328 patent at 6:35-40 ("The quotation system computer is schmatically [sic] shown in FIG. 4 as the 'Central Office' and includes a random access memory for temporary storage of information, a read only memory for permanent storage of the computers configuration and basic operating commands.").) This portion of the specification does not "clearly link" the function with any ascertainable structure in the specification, and Plaintiff's argument that storage for "accepting" quotes is implied or inherent in the system has no support in the specification. The specification does not describe any structure that "accepts" "quotes from the vendor terminals." Rather, various sections of the specification are sought to be knitted together to create a structure for this term. As there is no identifiable structure for this term, the term is indefinite. *See B. Braun Med.*, 124 F.3d at 1424.

This conclusion is also supported by the prosecution history. During prosecution, the patentee described the "means for accepting terms of a quote from vendor terminals" as: "[t]his means is limited to the algorithms disclosed in the specification, which algorithms do in fact obtain necessary terms of a transaction." (JA 1298.) This clear statement during reexamination shows that the patentee limited this term to a special-purpose computer with an associated algorithm in the specification. Thus, the "means . . . for accepting" is specialized software, not

23

the hardware that Plaintiff now presses as the structure. Indeed, hardware such as the RAM and ROM disclosed in the patent cannot, as simply hardware, "accept[] the quotes from the vendor terminals." Plaintiff might have a more persuasive argument if the patent referred to "storing" or "saving" quotes,[20] but it specifically claimed a "means . . . for accepting said quotes."

In an attempt to explain this language in the prosecution history, Plaintiff argues that this phrase is one "means" with three functions, *i.e.*, matching, quote generating, and accepting. Plaintiff argues that, because of this, the patentee and the examiner both used the single "means" to refer to all three functions. This argument is not persuasive.[21] Finally, Plaintiff's argument that the USPTO specifically held that memory at the central computer was the "accepting means" is wrong. The language that the USPTO used in the prosecution history does not refer to an "accepting means." (*See* JA 1188.)

c. **"means for automatically notifying a buyer when particular items meeting specified conditions become available from a seller"**

The parties agree that this limitation is a means-plus-function limitation, but disagree as to whether it is implemented by a special-purpose computer. (Dkt. No. 110 at 16.)

Plaintiff initially argued that the function of this term is "a computer programmed to email the buyer information about an item(s) that becomes available for sale or becomes available for sale on specified term(s) and in which the buyer has pre-registered her interest in at least one feature of that item(s)." (Dkt. No. 91 at 9.) In its revised claim construction chart,

---

[20] Plaintiff previously made this argument in the *Lending Tree* matter for the phrase "storage means." *Lending Tree*, 2006 WL 2990363 at *23 ("The court concludes, however, that the better view is that the '328 patent storage means . . . refers to a specific structure—the computer's permanent and temporary storage.").

[21] Contrary to Plaintiff's argument, elsewhere in the prosecution history the USPTO refers specifically to a "means for matching" rather than "means . . . for accepting"—demonstrating that the parties did not exclusively refer to these three functions only using the term "means . . . for accepting." (*See*, *e.g.*, JA 1188.)

Plaintiff argued that the function is "automatically notifying a buyer when particular items meeting specified conditions become available from a seller." (Dkt. No. 110 at 16.) Plaintiff argues that the structure for this term is Figure 3 of the '328 patent. (Pl.'s Opening Br. at 27; Pl.'s Resp. Br. at 36; Dkt. No. 91 at 9.) In its revised filing, Plaintiff also relies on the '328 patent at 6:52-59. (Dkt. No. 110 at 16.) In the same revised filing, Plaintiff argues that this limitation is not implemented by a special-purpose computer. (*Id.*) Plaintiff had initially conceded that this function ***was*** accomplished by a programmed computer. (Pl.'s Resp. Br. at 35-36 ("The function is automatically notifying and the structure is a computer programmed to email the buyer information about an item(s) that becomes available for sale or becomes available for sale on specified term(s) and in which the buyer has pre-registered her interest in at least one feature of that item(s).").) Plaintiff now states that the structure is "[a]n email system." (Dkt. No. 123 at 77.)

Defendant argues that the function of this term is "automatically notifying a buyer (i.e., requestor) when a specified product becomes available." (Dkt. No. 110 at 16.) Defendant argues this term is indefinite as it lacks a computer algorithm for the claimed function.[22] (*Id.*)

The Court finds that the function for this term is "automatically notifying a buyer when a particular item or items meeting specific conditions becomes available from a seller." This term requires a special-purpose computer. The structure and algorithm for this term is limited to the flow chart shown at Figure 3. ('328 patent at Fig. 3.)

Defendant argues that there is no disclosure of an algorithm that ***automatically*** notifies a buyer, how the system receives a special sale posting, or how those posting are matched to registered buyers. But, as there is some disclosure, the Court must examine if the disclosure is

_____

[22] Defendant also argues that claim 11 cannot be reconciled with claim 4 on which it depends.

sufficient given the knowledge of one of ordinary skill in the art.  Here, the specification provides sufficient structure as it appears that one of ordinary skill in the art could design a program that could execute the disclosed algorithm, notwithstanding the fact that the disclosure does not provide each and every step necessary to create the software program.

### d. "**means for communicating** responses from said vendor terminals to said filter and broadcast means"

The parties agree that this term is a means-plus-function limitation, but the parties disagree as to whether this limitation is implemented by a special-purpose computer.  (Dkt. No. 110 at 9.)

Plaintiff argues that the function of the "means for communicating responses from said vendor terminals to said filter and broadcast means" limitation is "communicating responses from said vendor terminals to said filter and broadcast means."  (*Id.*)  Plaintiff's proposed structure for this function is "[t]he Internet or other computer communications network."  (*Id.*) Plaintiff argues that this limitation is not implemented by a special-purpose computer, but rather by the Internet or other computer communications network.  (*Id.*)

Defendant argues that "means for communicating responses from said vendor terminals to said filter and broadcast means" has the function of "[c]ommunicating from the vendor terminals to the filter and broadcast means information that is responsive to a RFQ."  (*Id.*) Defendant argues that this term is indefinite because it is not clear how information sent from vendor terminals to the filter and broadcast means can result in the generation of a quote.  (*Id.*)

The Court finds that the function of this claim is "communicating responses from the vendor terminals to the filter and broadcast means."  The Court further finds that the corresponding structure for this element must be implemented by a special-purpose computer. During prosecution, the patentee stated the following in order to distinguish a prior art reference:

Specifically, claim 5 requires a means for communicating the responses from the vendor terminals to the filter and broadcast means, and means at the filter and broadcast means for communicating a selected set of the responses to the requestor. ***These means . . . include specialized software for interfacing the central computer/filter means to the vendor computers. These means are limited to the use of this specialized software, and equivalents thereof***.

(JA 1303 (emphasis added).) Plaintiff made a clear disavowal of any other structure besides the use of specialized software, and equivalents thereof. *See Ballard Med. Products v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1359 (Fed. Cir. 2001). Thus, Plaintiff's current position that it does not involve a special-purpose computer was disavowed.

The '328 patent does disclose the use of "FTP," or "File Transfer Protocol," for communicating between vendor terminals and the filter and broadcast means. (*See, e.g.,* '328 patent at Fig. 4, 4:36-38, 5:40-44.) FTP is a standard network protocol used to transfer files over a network. FTP is the only specialized software disclosed in the '328 patent for this limitation. Therefore, the structure for this element is limited to FTP and equivalents thereof.

Plaintiff cites to a number of portions of the '328 patent as support for its proposed corresponding structure.[23] (Dkt. No. 110 at 9.) But these citations do not disclose any structure in the form of an algorithm—a necessary disclosure given the prosecution history of the '328 patent. First, Plaintiff cites to portions of the specification that discuss the Internet and "other communications arrangements." But "the Internet" cannot qualify as the claimed specialized software as it is neither an algorithm nor specialized software. And while the patent states that "other computer communications arrangements" may be used, there is no other disclosure of what these computer communication arrangements might be, what algorithm might be used, or disclosure linking them to the claimed function. Plaintiff also cites to the claims themselves for

---

[23] Plaintiff now cites to completely different portions of the specification in its claim chart before this Court compared to what was cited before the USPTO. (*Compare* JA 1303 *with* Dkt. No. 110 at 9.)

the corresponding structure, but these citations fail to give any structure to the "means for communicating" limitations claimed in the '328 patent. (Dkt. No. 110 at 9 (citing claims 1 & 2).) Plaintiff's citations to other portions of the specification are similarly deficient as they do not contain any algorithm and many address communications between the central computer and the requestors rather than communications between the vendor terminals and the filter and broadcast means. This patent has become a moving target, which is not helpful to the Court.[24]

### e. "**means** at said filter and broadcast means **for communicating** a selected set of said responses to said requestor"

The parties once again agree that this limitation is a means-plus-function limitation. But the parties disagree as to whether it is implemented by a special-purpose computer. (Dkt. No. 110 at 11.)

Although Plaintiff initially argued that this term should be construed the same way as "broadcast means" as set forth above, in its responsive claim construction brief it revised its proposed construction. In its revised proposal, Plaintiff argues that the function of this term is "communicating a selected set of responses," with the corresponding structure being "the Internet or other computer communications network" and "a computer programmed to apply or compare specified conditions to an item(s) of information to determine if the condition is met or not by the item(s) of information, wherein the item of information comes from a computer associated with a vendor." (*Id.*)

Defendant argues that the function of this claim is "filtering the set of vendor responses (*i.e.*, quotes) to determine a subset of quotes to forward to the requestor." (*Id.*) Defendant argues that the claim is indefinite for two reasons: (1) the specification fails to disclose any

---

[24] Many of Plaintiff's citations reference "communications networks" or "computerized networks" (*see, e.g.*, Dkt. No. 110 at 9 (citing, *inter alia*, the '328 patent at 2:43, 2:53-56, 3:29-36, 6:24-29, Fig. 1)—this is insufficient in light of Plaintiff's statement during reexamination that this "communications means" is limited to specialized software and equivalents thereof.

structures that perform the function, and (2) because there is no clear link between the claimed function and any software structure that allegedly creates a "selected set" of responses to forward to the requestor. Defendant argues that Plaintiff has offered three different constructions of this phrase, varying the construction during the original prosecution, during reexamination, and during the current claim construction briefing.

The Court finds that the function of this term is "communicating a selected set of vendor responses to the requestor." The Court finds that the corresponding structure in the specification is "applying or comparing specified conditions to an item(s) of information to determine if the condition is met or not by the item(s) of information, wherein the item of information comes from a computer associated with a vendor" (the function of determining the "selected set" of vendor responses) and "FTP" (the communicating function). (*See* '328 patent at Fig. 4, 4:36-38, 5:40-44, 5:21-25.) As explained above, the "communication" function of this term is disclosed in the patent as FTP.[25] The structure associated with the "selected set" portion of this term is stated in the claim: "means *at said filter and broadcast means* for communicating . . . ." The text shows that the "selecting" portion of this term overlaps with the filter and broadcast means discussed above. The specification explains that the filtering function can be applied with respect "to whom the RFQ is given *and/or to whom responses are given*." ('328 patent at 5:23-25; *see also id*. at 8:16-20.) Thus, the corresponding structure in the specification is "applying or comparing specified conditions to an item(s) of information to determine if the condition is met or not by the item(s) of information, wherein the item of information comes from a computer

---

[25] While the patent discusses "the Internet," it cannot be the corresponding structure for this element. Plaintiff clearly disavowed any structure that did not include the use of specialized software. (JA 1303 ("Specifically, claim 5 requires a . . . means at the filter and broadcast means for communicating a selected set of the responses to the requestor . . . . *These means are limited to the use of this specialized software*, and equivalents thereof." (emphasis added)).) Referencing "the Internet" does not disclose an algorithm, and "the Internet" is not software.

associated with a vendor" for the portion of the function that determines the "selected set" of vendor responses.

### f. "obtaining . . . quotes"

The parties agree this claim term is not a means-plus-function limitation. (Dkt. No. 110 at 18.) Plaintiff argues that this term should be construed as "the system acquiring quotes using software that interfaces to a database associated with the vendor of the quote." (Dkt. No. 91 at 11.) Defendant argues that this claim should be construed as "[p]roviding vendors with software and using that software to interrogate the vendor's database to generate a quote." (*Id.*) In Defendant's most recent filing, it contends that the phrase should be construed as "using predistributed vendor software to interrogate a vendor's database to generate a quote." (Dkt. No. 123 at 100.)

The Court construes this term as "the system acquiring the required and available quote information from the vendor's product database using pre-distributed software." This construction is supported by the text of the claim and the specification. For example, the specification describes the process of obtaining "RFQ information": "When contacted the Central Office would acquire via suitable vendor software the RFQ information required and available from the vendors [*sic*] product database." ('328 patent at 4:40-45.) The specification also describes the system contacting the vendor's product database using software: "the quotation system would interrigate [*sic*] the vendor's product database (using suitable software which links or cross references the vendor's inventory to the quotation system product and services lists) and retrieve pricing and other information necessary to respond to the RFQ." (*Id.* at 5:42-48.)

During reexamination, the patentee stated that pre-distributed software is necessary for the system. (*E.g.*, JA 1305 ("Such system is not possible absent the pre-distribution of software

to allow the filtering central computer to interface with the computers of the vendors, a feature described in the '328 patent . . . ."), JA 1478 n.4 ("That is why the '328 patent specifically teaches that the vendor software is predistributed . . .").) This is a clear disavowal of claim scope. *See Ballard*, 268 F.3d at 1359. In other words, the software must be pre-distribution.

## IV. CONCLUSION

For the reasons discussed above, the Court construes the disputed claim terms as set forth in the chart below. An appropriate Order will issue.

| Claim Term | Construction |
|---|---|
| "filter and broadcast means for receiving, over said data network, requests from said requestor to engage in transactions with unspecified vendor terminals, and for filtering said requests to determine with which vendor terminals said requests should be matched"<br><br>[Claim 4]<br><br>"filtering, at said filter means, the at least one request for quotation in order to ascertain a set of sellers potentially capable of supplying said goods or services"<br><br>[Claim 12, Claim 20] | Filter Function: "filtering the requests for quotation to determine which vendor terminals the requests for quotation should be matched"<br><br>Structure/Algorithm: "(1) selecting a class of vendors who sell the requested item(s), and (2) applying or comparing specified conditions to an item(s) of information to determine if the condition is met or not by the item(s) of information" and equivalents thereof<br><br>Receiving Function: "receiving, over the data network, requests from the requestor to engage in transactions with unspecified vendor terminals"<br><br>Structure: Internet HTML pages; a menu function for permitting users to enter RFQ information to be conveyed to the central computer; downloading requests for quotation through a file transfer protocol (FTP); and equivalents thereof |

| Claim Term | Construction |
|---|---|
| "means for matching said requests with vendor terminals which meet predetermined filter conditions for generating quotes from information contained in a database associated with said vendor terminals, and for accepting said quotes from said vendor terminals"<br><br>[Claim 4] | Matching Function: "matching the requests with vendor terminals which meet predetermined filter conditions"<br><br>Structure/Algorithm: None disclosed, indefinite<br><br>Generating Quotes Function: "generating quotes from information contained in a database associated with the vendor terminals"<br><br>Structure/Algorithm: None disclosed, indefinite<br><br>Accepting Function: "accepting the quotes from the vendor terminals"<br><br>Structure/Algorithm: None disclosed, indefinite |
| "means for automatically notifying a buyer when particular items meeting specified conditions become available from a seller"<br><br>[Claim 11] | Function: "automatically notifying a buyer when a particular item or items meeting specific conditions becomes available from a seller"<br><br>Structure/Algorithm: Figure 3 and equivalents thereof |
| "means for communicating responses from said vendor terminals to said filter and broadcast means"<br><br>[Claim 5] | Function: "communicating responses from the vendor terminals to the filter and broadcast means"<br><br>Structure/Algorithm: FTP and equivalents thereof |

| Claim Term | Construction |
|---|---|
| "means at said filter and broadcast means for communicating a selected set of said responses to said requestor"<br><br>[Claim 5] | Function: "communicating a selected set of vendor responses to the requestor"<br><br>Structure/Algorithm:<br><br>"applying or comparing specified conditions to an item(s) of information to determine if the condition is met or not by the item(s) of information, wherein the item of information comes from a computer associated with a vendor" and equivalents thereof [the function of obtaining the "selected set" of vendor responses] and<br><br>FTP and equivalents thereof [the communicating function] |
| "obtaining . . . quotes"<br><br>[Claim 12, Claim 20] | "the system acquiring the required and available quote information from the vendor's product database using pre-distributed software" |

**IT IS SO ORDERED.**

**/s/ Faith S. Hochberg_____**
**Hon. Faith S. Hochberg, U.S.D.J.**