NOT FOR PUBLICATION – FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SOURCE SEARCH TECHNOLOGIES, LLC, | : | Civil No. 11-3388 (FSH) |
| Plaintiff, | : | |
| v. | : | **OPINION** |
| KAYAK SOFTWARE CORP., | : | |
| Defendant. | : | June 16, 2014 |

**HOCHBERG, District Judge:**

This matter comes before the Court on Defendant Kayak's motions for summary judgment regarding damages, non-infringement, and invalidity due to anticipation and obviousness (Dkt. Nos. 138 & 139). The Court has reviewed the submissions of the parties and considered the motion on the papers in accordance with Federal Rule of Civil Procedure 78.[1]

### I.    BACKGROUND[2]

SST brings this action alleging infringement of U.S. Patent No. 5,758,328 ("the '328 patent") by Kayak. The '328 patent is titled "Computerized Quotation System and Method." Joseph Giovannoli filed the patent application that would later issue as the '328 patent on

---

[1] The Court also considered Source Search Technologies' sur-reply (Dkt. No. 173).

[2] Unless otherwise noted, these facts come from the parties' statements of undisputed facts. DS refers to Defendant's statement of undisputed facts, and PR refers to Plaintiff's response to Defendant's statement of undisputed facts.

February 22, 1996. The '328 patent issued May 26, 1998. On August 11, 2011, there was a reexamination request for the '328 patent. The reexamination certificate for the patent issued March 21, 2013. During reexamination, several of the '328 patent's claims were cancelled, added, or modified.

The '328 patent describes a computerized system for processing requests for quotations ("RFQs") between buyers and sellers over a network. On January 27, 2014, the Court issued a claim construction opinion construing the disputed terms of the '328 patent. (Dkt. Nos. 131 & 132.) SST alleges that Kayak infringes claims 12 and 20 of the '328 patent. Claims 12 and 20 are both method claims and reproduced below:

> 12. A method of purchasing goods or services over a data network comprising the steps of:
> - communicating, over said data network, to a filter means, at least one request for a quotation from a potential buyer of said goods or services;
> - filtering, at said filter means, the at least one request *for quotation* in order to ascertain a set of sellers potentially capable of supplying said goods or services; and
> - obtaining, from at least one of said potential sellers *previously ascertained by said filtering said request for quotation*, over a data network, quotes to supply said goods or services, and forwarding said quotes to said potential buyer, wherein at least part of the quote information is stored at a location remote from said filter means.

> *20. A method of purchasing goods or services over a data network comprising the steps of:*
> - *communicating, over said data network, to a filter means, at least one request for a quotation from a potential buyer of said goods or services;*
> - *filtering, at said filter means, the at least one request for quotation in order to ascertain a set of sellers potentially capable of supplying said goods or services; and*
> - *obtaining, by said filter means, responsive to said filtering, from at least one of said potential sellers, over a data network, quotes to supply said goods or services, and forwarding said quotes to said potential buyer, wherein at least part of the quote information is stored at a location remote from said filter means.*

2

### A. Kayak's System

Kayak is a well-known travel website. It connects users to online travel agents, airlines, and data aggregators. (DS ¶ 2; PR ¶ 2.) For example, Kayak's infringement expert, Dr. Felten, used Kayak's website to search for flights between Boston and Atlanta. (DS ¶ 3; PR ¶ 3.) That search identified over 2,400 separate fares on numerous airlines. (*Id.*) In 2012, Kayak processed 1.2 billion user queries. (DS ¶ 4; PR ¶ 4.)

Kayak's flight search results come with a disclaimer that reads, in relevant part, "[w]e make every attempt to get accurate prices, however, prices are not guaranteed." (DS ¶ 5; PR ¶ 5.) About 9% of Kayak's price search results are off by $10 or more. (DS ¶ 12; PR ¶ 12.) Pricing and availability are subject to change because many people may be trying to buy the same travel option simultaneously. (DS ¶ 14; PR ¶ 14.)

Kayak's system communicates with travel providers using a "spider searcher." (DS ¶ 25; PR ¶ 25.) These spider searchers are specifically designed to work with a travel provider's application programming interface ("API"). (DS ¶¶ 24-27; PR ¶¶ 24-27.) The spider searchers are hosted on Kayak's system and communicate with the travel provider's API; the API then queries the travel provider's database of information. (*See* Dkt. No. 139-17 at 13-15; Dkt. No. 155 at 9-10.) The spider searchers translate user queries and vendor responses so the systems can communicate. (DS ¶ 25; PR ¶ 25.)

### B. The Prior Art

With respect to anticipation and obviousness, Kayak relies on two primary pieces of alleged prior art. The first is U.S. Patent No. 5,012,953 ("Webber"). Webber teaches an airline reservation system that takes into account preset user travel preferences. (DS ¶ 35; PR ¶ 35.) The parties dispute the details of how this system operates.

3

The second piece of alleged prior art is the system described by Arthur M. Keller in "Smart Catalogs and Virtual Catalogs" ("Keller"). (DS ¶ 61; PR ¶ 61.) The parties dispute whether Keller qualifies as prior art to the '328 patent and what that reference teaches.

## II.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, "[s]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. *Peters v. Delaware River Port Auth.*, 16 F.3d 1346, 1349 (3d Cir. 1994). The judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 860 (3d Cir. 1990).

The party seeking summary judgment always bears the initial burden of production. *Celotex Corp.*, 477 U.S. at 323. This burden requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or to demonstrate that the nonmoving party has not shown the requisite facts relating to an

essential element of an issue on which it bears the burden. *Id*. at 322-23. Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party.

To avoid summary judgment, the nonmoving party must then demonstrate facts supporting each element for which it bears the burden, and it must establish the existence of a "genuine issue of material fact" justifying trial. *Miller*, 843 F.2d at 143; *accord Celotex Corp.*, 477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. at 587 (quoting *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Further, summary judgment may be granted if the nonmoving party's "evidence is merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249-50.

## III. DISCUSSION

Kayak moves for summary judgment with respect to damages, invalidity, and infringement. These issues are addressed in turn below.

### A. Damages

Kayak moves to limit the time period where SST may collect damages under two theories. First, Kayak argues that SST substantively changed claims 12 and 20 during reexamination and, therefore, damages must be limited to the time period after the '328 patent's reexamination certificate issued. Second, Kayak argues that it is entitled to summary judgment of laches.

#### i. Limiting Damages due to Reexamination

"A patentee of a reexamined patent is entitled to infringement damages, *inter alia*, for the period between the date of issuance of the original claims and the date of issuance of the

5

reexamined claims if the original and reexamined claims are 'identical.'" *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998). "Reexamined claims are 'identical' to their original counterparts if they are 'without substantive change.'" *Id.* "[I]n determining whether substantive changes have been made, we must discern whether the *scope* of the claims are identical, not merely whether different words are used." *Id.* (emphasis in original). "If substantive changes have been made to the original claims, the patentee is entitled to infringement damages only for the period following the issuance of the reexamination certificate."[3] *Id.; see also* 35 U.S.C. §§ 307(b) and 252; *Predicate Logic, Inc. v. Distributive Software, Inc.*, 544 F.3d 1298, 1305 (Fed. Cir. 2008). "[T]he interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law, exclusively for the court." *Laitram*, 163 F.3d at 1347.

### 1. The Reexamination

During reexamination, SST added two phrases to claim 12. The changes from original claim 12 to reexamined claim 12 are in italics below:

---

[3] Although the Federal Circuit has noted that "it is difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment," there is no *per se* rule that a claim amendment made during reexamination following a prior art rejection is automatically to be regarded as a substantive change. *Laitram*, 163 F.3d at 1347-48. Rather, a Court must "analyze the claims of the original and the reexamined patents in light of the particular facts, including the prior art, the prosecution history, other claims, and any other pertinent information" to determine whether a claim change is substantive. *Id.*

> **12.** A method of purchasing goods or services over a data
> network comprising the steps of:
>
> communicating, over said data network, to a filter means, at
> least one request for a quotation from a potential buyer
> of said goods or services;
>
> filtering, at said filter means, the at least one request *for
> quotation* in order to ascertain a set of sellers potentially
> capable of supplying said goods or services; and
>
> obtaining, from at least one of said potential sellers *previ-
> ously ascertained by said filtering said request for quo-
> tation*, over a data network, quotes to supply said goods
> or services, and forwarding said quotes to said potential
> buyer, wherein at least part of the quote information is
> stored at a location remote from said filter means.

('328 patent at reexamined claim 12; DS ¶ 20; PR ¶ 20.) A short review of the '328 patent's

reexamination history is necessary to determine if these changes were substantive.

On January 18, 2012, during reexamination, original claim 12 was rejected as obvious in

light of two prior art references, Silverman and CECC. (DS ¶ 7; PR ¶ 7.) Following this

rejection, SST conducted an interview with the USPTO patent examiners. (DS ¶ 8; PR ¶ 8.) On

March 8, 2012, SST added new claim 20 and argued that Silverman was not prior art due to

SST's alleged earlier date of invention. (DS ¶ 9; PR ¶ 9.) When SST added claim 20 during

reexamination, it stated that "[c]laim 20 is the same claim as claim 12, with a grammatical

omission filled in for clarity."[4] (JA 1290.)

On May 28, 2012, the USPTO rejected SST's arguments, finding that Silverman taught

the elements SST claimed were missing from the prior art. (JA 1354-55.) The USPTO also

stated that claim 12 "does not recite 'an RFQ'" and that "the claim does not state that the

obtaining step is performed responsive to receiving the request." (*Id.*) The examiner noted that

---

[4] Later in the reexamination, SST stated that "[r]egarding claims 12 and 20, the only difference
between the two is the additional language in claim 20 directed to 'by said filter means,
responsive to said filtering.' Patent owner believes claim 12, in view of the specification, should
be interpreted identically to claim 20." (JA 1480; *see also* JA 1481, JA 1522.)

in reviewing patent scope, the USPTO uses a different standard of review than this Court. (*Id.* (noting that "claims are given their broadest reasonable interpretation consistent with the specification" during prosecution).)

On June 28, 2012, SST amended claim 12 to specify that the "filter means" filters "a request *for quotation*," but SST did not amend the obtaining step to state that it occurs responsive to the request for quotation. (DS ¶ 11; PR ¶ 11.) In the same response, SST amended new claim 20 to state that the request is a "request *for quotation*" and that the obtaining step in claim 20 is "responsive to said filtering." (DS ¶ 12; PR ¶ 12; *see also* JA 1424.) SST explained that the amendments to claims 12 and 20 were to "clarify" that the "request" referred to the earlier mentioned RFQ. (JA 1436, JA 1474, JA 1516.) Similarly, SST argued that the addition of the phrase "previously ascertained by said filtering said request for quotation" to claim 12 merely clarified that the quote is obtained from one of the potential sellers identified in in the previous filtering step. (JA 1523.) SST interviewed the USPTO examiners again on July 24, 2012, August 29, 2012, and August 31, 2012. (DS ¶ 13; PR ¶ 13.) SST submitted supplemental amendments after final rejection on July 31, 2012, August 7, 2012, and August 31, 2012. (DS ¶ 14; PR ¶ 14.) None of those amendments resulted in allowance. (DS ¶ 15; PR ¶ 15.) In an advisory action mailed on October 1, 2012, the examiner maintained that claim 12 was obvious over Silverman and CECC. (DS ¶ 16; PR ¶ 16.)

SST appealed the examiner's rejection to the Patent Trial and Appeal Board and argued that Silverman does not teach *first* filtering the RFQ to ascertain a set of sellers and *then* obtaining quotes from one of those sellers ascertained by the filtering step. (DS ¶ 17; PR ¶ 17.) In the same appeal, SST argued that both claim 12 and claim 20 had required this particular ordering prior to SST's amendments but that it amended the claims to expedite prosecution. (JA

1667-70.)  Following the filing of the appeal brief, SST had four telephone interviews with the USPTO on January 10, 2013, January 15, 2013, January 23, 2013, and January 24, 2013.  (JA 1717, JA 1724.)  On January 25, 2013, SST amended claim 12 to state that the potential sellers were "previously ascertained by said filtering said request for quotation."  (JA 1710.)

In its Notice of Intent to Issue Reexamination Certificate, the USPTO stated that "Silverman and CECC fail to teach 'obtaining, from at least one of said potential sellers previously ascertained by said filtering said request for quotation, over a data network, quotes to supply said goods or services.'"  (JA 1740-41 (emphasis in original).)  With respect to claim 20, the Notice of Intent to Issue Reexamination Certificate stated that "Silverman fails to teach 'obtaining, by said filter means, responsive to said filtering, from at least one said potential sellers, over a data network, quotes to supply said goods or services' as required by the claim."  (*Id.* (emphasis in original).)  In other words, the quotes were not provided after the filtering step in Silverman.  (*Id.*)

## 2.  Claim 12

The key issue with respect to claim 12 is whether the reexamined claim is "identical" (*i.e.*, without substantive change) to original claim 12.

During reexamination, SST added the words "for quotation" to the filtering step of claim 12.  The specification and text of original claim 12 support finding that this change was not substantive.  Original claim 12 states that the method includes "communicating, over said data network, to a filter means, at least one request for a quotation . . . ."  ('328 patent at claim 12.)  The next recited step of original claim 12 is "filtering, at said filter means, the at least one request in order to ascertain a set of sellers potentially capable of supplying said goods or services."  (*Id.*)  In context, it is clear that "the request" referred to in the filtering step is the

9

request for quotation recited in the previous communicating step. Nothing in the reexamination prosecution history conflicts with this plain meaning of the claim. When SST added the words "for quotation" to the claim during reexamination, it argued that such an addition was unnecessary as request should be understood to mean a request for quotation. The entire claimed invention focuses on requests for quotations. (*See*, *e.g.*, '328 patent at Title ("Computerized Quotation System and Method"), Abstract ("A computerized system . . . for processing requests for quotation. . . ."), 5:9-11 ("The RFQ is then processed to select vendors who are capable of quoting on the RFQ").) This change was not substantive.

During reexamination, SST also added the phrase "previously ascertained by said filtering said request for quotation" to the obtaining step of claim 12. Original claim 12 described a filtering step, "filtering, at said filtering means, the at least one request in order to ascertain a set of sellers potentially capable of supplying said goods or services," followed by an obtaining step, "obtaining, from at least one of said potential sellers, over a data network, quotes to supply said goods or services. . . ." ('328 patent at claim 12.) In context, it is clear that original claim 12's obtaining step referenced the potential sellers that were ascertained in previous filtering step. In other words, the order (*i.e.*, first filtering the RFQ to ascertain a set of sellers and then obtaining quotes from at least one of those sellers) is implicit in original claim and confirmed by the specification. *See Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1376 (Fed. Cir. 1998) (holding that "the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise"). For example, Figure 2A describes a method where the quotations come from a class of vendors who first meet the filter requirements. ('328 patent at Fig. 2A; *see also*

10

'328 patent at 5:37-39 ("***Once vendors are selected*** to receive RFQs, the RFQ information may be transmitted to them via FTP. . . ." (emphasis added)).)

The original prosecution history and reexamination prosecution history for the '328 patent supports this interpretation. (*See* JA 79 (describing the invention as receiving an RFQ, determining a small group of vendors, and "then" sending the RFQ to the small group of vendors), JA 81-82 ("[N]one of these systems includes a centralized filter and broadcast means which first filters the RFQ to obtain a small subset of potential vendors and then matches the RFQ with these potential vendors so that quotes are supplied to the buyer."), JA 1295 ("***After ascertaining this set of vendors***, the central system than [sic] communicates with one or more of these other vendor computer systems in order to pull numerous terms of a quote from the vendor computer." (emphasis added)), JA 1300 (describing a two-phase system), JA 1329, JA 1647-48.) The step of obtaining quotes after ascertaining a set of sellers was implicit in the original claim. There is no other reasonable interpretation of original claim 12, and the addition of the phrase "previously ascertained by said filtering said request for quotation" during reexamination was not a substantive change.    Therefore, damages are not confined to the period after the reexamination certificate issued based on § 252, ¶ 1.

### 3. Claim 20

As a preliminary matter, Kayak argues that SST may not collect damages on claim 20 from before the issuance of the reexamined patent because it did not exist prior to reexamination. (Dkt. No. 138-1 at 8.)  In *Henrob Ltd. v. Bollhoff Systemtechnick GMBH & Co.*, Civ. No. 05-73214, 2009 WL 3188572 (E.D. Mich. Sept. 29, 2009) another district court faced this same argument and rejected it. The *Henrob* Court analyzed § 252 (a section of the Patent Act that describes the effect of reissue on patent rights) and § 307 (a section of the Patent Act that applies

§ 252 to reexamined patents), and determined that a patentee could collect damages on a new claim issued during reexamination if that claim was "substantially identical" to a claim in the original patent. *Id*. at \*12; *see also* 35 U.S.C. § 252. The Court finds this reasoning persuasive. Specifically, § 307(b) states:

> ***Any proposed amended or new claim*** determined to be patentable and incorporated into a patent following a reexamination proceeding ***will have the same effect as that specified in section 252*** for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who made substantial preparation for the same, prior to issuance of a certificate under the provisions of subsection (a) of this section.

*Id*. (emphasis added).  By its plain language, § 307(b) applies § 252 to both new and amended claims.   In other words, under these sections a patentee may collect damages from before reexamination if the new or amended claims are "substantially identical" to a claim in the original patent. 35 U.S.C. § 252, ¶ 1.  Thus, the critical question is whether claim 20 is identical to a claim from the original '328 patent. *Laitram*, 163 F.3d at 1346. SST argues that claim 20 is identical to original claim 12 (or at least without substantive change).  The chart below identifies the differences between the two claims:

| Claim 12 | Claim 20 | Differences |
|---|---|---|
| A method of purchasing goods or services over a data network comprising the steps of: | A method of purchasing goods or services over a data network comprising the steps of: | None |
| communicating, over said data network, to a filter means, at least one request for a quotation from a potential buyer of said goods or services; | communicating, over said data network, to a filter means, at least one request for a quotation from a potential buyer of said goods or services; | None |

| filtering, at said filter means, the at least one request for quotation in order to ascertain a set of sellers potentially capable of supplying said goods or services; and | filtering, at said filter means, the at least one request for quotation in order to ascertain a set of sellers potentially capable of supplying said goods or services; and | None |
|---|---|---|
| obtaining, from at least one of said potential sellers *previously ascertained by said filtering said request for quotation*, over a data network, quotes to supply said goods or services, | obtaining, *by said filter means, responsive to said filtering*, from at least one of said potential sellers, over a data network, quotes to supply said goods or services, | Claim 12: previously ascertained by said filtering said request for quotation<br><br>vs.<br><br>Claim 20: by said filter means, responsive to said filtering |
| and forwarding said quotes to said potential buyer, wherein at least part of the quote information is stored at a location remote from said filter means. | and forwarding said quotes to said potential buyer, wherein at least part of the quote information is stored at a location remote from said filter means. | None |

As shown above, claims 12 and 20 are almost identical. There are slight variations in their language in the obtaining step of the claims, but these variations do not change the meaning of claim 20. Indeed, it is clear from the prosecution history that "responsive to said filtering" was added to clarify that the step of obtaining quotes from potential sellers must come after the filtering step (a requirement that was already implicitly present in original claim 12). (JA 1740-41 (stating that Silverman does not teach providing quotes after filtering).) Claim 20 is coextensive with claim 12. Therefore, the discussion above with respect to claim 12 applies to claim 20, and Kayak is not entitled to limit any potential damages to after the issuance of the reexamination certificate based on § 252, ¶ 1.

13

### ii. Laches

"Where the defense of laches is established, the patentee's claim for damages prior to suit may be barred." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992). "Two elements underlie the defense of laches: (a) the patentee's delay in bringing suit was unreasonable and inexcusable, and (b) the alleged infringer suffered material prejudice attributable to the delay." *Id.* "The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances," and "[t]he period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit." *Id.* at 1032. Prejudice may be either economic or evidentiary. *Id.* at 1033.

"A presumption of laches arises where a patentee delays bringing suit for more than six years after the date the patentee knew or should have known of the alleged infringer's activity." *Id.* at 1028. "A presumption has the effect of shifting the burden of going forward with evidence, not the burden of persuasion." *Id.* A plaintiff may rebut the presumption of laches by showing either that the delay was reasonable or that there was no prejudice to defendant. *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1293 (Fed. Cir. 1992). Once the presumption is rebutted, the defendant must come forward with evidence of both unreasonable delay and prejudice. *Id.*

Here, there are disputed issues of fact with respect to both factors. SST has come forward with evidence suggesting that its delay might be reasonable, *i.e.*, that for a portion of the delay certain claims of the '328 patent were unenforceable, that SST was suing other alleged infringers, and that SST reasonably did not know about Kayak's infringement. (PR ¶¶ 1-3; Dkt. No. 145 at 19.) These are possible excuses for not bringing a suit earlier. *Hemstreet*, 972 F.2d at

14

1293. Because there are disputes of material fact, summary judgment will not be granted on laches. Kayak may re-raise this defense at trial, and the Court will decide it with the benefit of a full record, live testimony, and cross examination.[5]

### B. Invalidity

Kayak moves for summary judgment of anticipation and obviousness based on two main pieces of prior art—Webber and Keller. These documents are discussed below.

#### i. Anticipation

"To anticipate a claim, a single prior art reference must expressly or inherently disclose each claim limitation. . . . But disclosure of each element is not quite enough—this court has long held that [a]nticipation requires the presence in a single prior art disclosure of all elements of a claimed invention arranged as in the claim." *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1383 (Fed. Cir. 2011) (internal citations and quotation marks omitted). "[I]nherent anticipation requires more than mere probabilistic inherency and more than the presence of an unrecognized *de minimis* quantity of claimed substance in the prior art." *Id.* (internal citations and quotation marks omitted). But inherency does not require recognition of the inherent element. *Id.* The reference must also "enable one of ordinary skill in the art to make the invention without undue experimentation." *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009). "While anticipation is a question of fact, it may be decided on summary judgment if the record reveals no genuine dispute of material fact." *Leggett*

---

[5] Recently, the Supreme Court held that laches could not apply to copyright infringement claims brought within the three-year statute of limitations period found within that act. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1974 (2014) ("[I]n face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief.") While the Court did not rule on laches' continued applicability to patent infringement, *see id.* at 1974 n.15, its holding may call into question laches' continued viability as a bar to damages within the Patent Act's six-year statute of limitations.

& *Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1352 (Fed. Cir. 2008) (internal quotation marks omitted). "Anticipation must be proven by clear and convincing evidence." *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1322 (Fed. Cir. 2012) (internal citations and quotation marks omitted).

Kayak argues that the Webber patent anticipates claims 12 and 20 of the '328 patent because it contains each and every limitation found in claims 12 and 20 of the '328 patent. For example, Kayak argues that at least part of the information returned by Webber (*i.e.*, seat availability) is acquired from a vendor database named Apollo as required by claims 12 and 20 of the '328 patent. (Dkt. No. 139-17 at 21.)

In response, SST argues that Webber does not anticipate the '328 patent for at least three reasons. First, it argues that Webber does not filter a RFQ to determine which airlines are potentially capable of supplying the desired flight and then obtaining a quote from one or more of those previously ascertained airlines. (Dkt. No. 155 at 17.) Second, SST argues that Webber uses a single central database that contains all of the elements necessary to respond to a RFQ from all vendors, whereas the claims at issue require that at least part of the quote information be stored at a location remote from the filter. (*Id.*) Finally, SST argues that the Webber system obtains the necessary quote information from a third party rather than the potential seller. (*Id.* at 19.)

At summary judgment this Court cannot make credibility determinations and must construe the facts in a light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 249; *see also Peters*, 16 F.3d at 1349. The parties clearly disagree about what Webber discloses and teaches to one of skill in the art and whether its teachings match the claims of the '328 patent. Indeed, there are many disputed issues of fact with respect to Webber. (*See, e.g.*, DS ¶¶

16

36-37, 40, 42-49, 51-55, 60; PR ¶¶ 36-37, 40, 42-49, 51-55, 60.)  Therefore, the Court denies Kayak's motion for summary judgment of anticipation.

<em>ii. Obviousness</em>

"A patent may not issue 'if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068 (Fed. Cir. 2012) (quoting 35 U.S.C. § 103(a)), *cert. denied*, 133 S. Ct. 933 (2013).  "A party seeking to invalidate a patent based on obviousness must demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'"[6] *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)).  "Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) objective considerations of nonobviousness." *Cyclobenzaprine*, 676 F.3d at 1068.

1.  The Prior Art

Kayak relies on the Keller Reference, in combination with one or more other references, for its obviousness summary judgment motion.

---

[6] "The Supreme Court has warned, however, that, while an analysis of any teaching, suggestion, or motivation to combine known elements is useful to an obviousness analysis, the overall obviousness inquiry must be expansive and flexible." *Cyclobenzaprine*, 676 F.3d at 1069.

In response, SST argues that Keller is not prior art because (i) Kayak has failed to show the document was distributed publicly as of the claimed date and (ii) the named inventor of the '328 patent can "swear behind"[7] Keller (*i.e.*, show that he conceived of the invention prior to the date of Keller and was diligent in reducing the claimed invention to practice).[8] *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996) ("Thus, under section 102(a), a document is prior art only when published before the invention date.").

There are disputed issues of fact with respect to the Keller Reference. For example, the parties dispute whether or not Keller is § 102(a) prior art based on several disputed fact issues: Was Keller publicly available? Is the '328 patent entitled to an earlier conception date? Does Keller disclose "quotes?" Because there are material facts in dispute, Kayak's motion for summary judgment of obviousness is denied.[9]

---

[7] Section 102(a) states that "[a] person shall be entitled to a patent unless - (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, *before the invention thereof by the applicant for patent*." 35 U.S.C. § 102(a) (emphasis added). In 2011 Congress passed the Leahy-Smith America Invents Act (AIA), Pub.L. No. 112–29, 125 Stat. 284 (2011), which modified 35 U.S.C. § 102. Since the new statute does not apply to patents with effective filing dates predating the law's effective date of March 16, 2013, *see id.* at 293, the Court relies on the pre-AIA version of the statute.

[8] SST also argues in its opposition brief that Kayak's attorneys violated the rules of professional conduct by representing Mr. Keller (the author of the alleged prior art) during the deposition free of charge and paying Mr. Keller for his time in—and preparing for—the deposition. Although no motion for sanctions has been filed by SST (and any request for sanctions should have been brought as a motion and not simply as an argument in an opposition brief), SST requests that the Court disregard Mr. Keller's testimony and documents, which is a request for a severe sanction. Based on the facts developed in the briefs on this issue, there is no conduct warranting sanctions. There are many genuine issues in this case that need to be addressed. That is what this Court will focus upon. The request to bar this testimony and documentary evidence is denied.

[9] SST argues that Kayak introduced new combinations of prior art in its summary judgment motion that were never disclosed during discovery. (Dkt. No. 155 at 39-40.) If SST needs additional discovery, it should make that request now, support the request with its non-disclosure

### C. Infringement

SST alleges that Kayak directly infringes claims 12 and 20 of the '328 patent under 35 U.S.C. § 271(a). "Determining infringement requires two steps. First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (internal quotation marks omitted). "To establish liability for direct infringement of a claimed method or process under 35 U.S.C. § 271(a), a patentee must prove that each and every step of the method or process was performed." *Move, Inc. v. Real Estate Alliance Ltd.*, 709 F.3d 1117, 1122 (Fed. Cir. 2013). "Infringement, whether literal or under the doctrine of equivalents, is a question of fact." *Absolute*, 659 F.3d at 1129-30.

Kayak argues that it does not infringe the '328 patent for two reasons: (i) that its system does not use predistributed software to obtain quotes and (ii) that its system does not receive "requests for quotation" or provide "quotes."

### i. Predistributed Software

The Court construed "obtaining . . . quotes" to mean "the system acquiring the required and available quote information from the vendor's product database using predistributed software."

Kayak argues that it does not infringe claims 12 and 20 of the '328 patent for two reasons. First, it argues that it does not distribute software to vendors.[10] Instead, Kayak argues

---

argument, and present it to the magistrate judge. This Court will not now bar evidence when the case is not close to being trial ready.

[10] The Court finds that Kayak did not waive its argument that the predistributed software must be provided to vendors. Kayak's final proposed claim construction for "obtaining . . . quotes" was

that it creates custom software known as "spider searchers" that interface with each provider's application programming interface ("API"), but it never sends that software to vendors. (DS ¶¶ 24-27; PR ¶¶ 24-27.) Second, Kayak argues that its spider software does not query a vendor's database. (DS ¶¶ 29-31.) Kayak maintains that its software queries a provider and then the provider's own software—the API—queries the provider's database. (Dkt. No. 139-17 at 13-14.)[11]

In response, SST argues that Kayak conflates the location of the software (*i.e.*, whether it is "hosted" on Kayak's system or on the vendor's system) with whether it is predistributed. (Dkt. No. 155 at 10-11.) SST asserts that Kayak's system predistributes software by assigning or allocating a "spider searcher" for each provider. (Dkt. No. 155 at 9-10; PR ¶¶ 29, 32.) SST's expert also submitted an expert report explaining how he believes Kayak meets this limitation. (*See* Dkt. No. 154-8 (Ex. J).) This "spider search" then interfaces with each provider's API to retrieve information from the vendor database. (Dkt. No. 155 at 9-10; PR ¶¶ 29, 31, 32.) SST asserts that the travel provider must use Kayak's spider software to return results to Kayak. (*Id.*)

---

"using *predistributed vendor software* to interrogate a vendor's database to generate a quote." (Dkt. No. 131 at 30.) Kayak clearly stated that the software should be *vendor* software.

[11] Kayak's other arguments relate to whether its software "cross-references inventory with Kayak's server." (Dkt. No. 139 at 14-15.) The Court's construction of this term does not say anything about cross-referencing when obtaining a quote, and additional limitations that are not present in the claim should not be read in. *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) ("It is entirely proper to use the specification to interpret what the patentee meant by a word or phrase in the claim. But this is not to be confused with adding an extraneous limitation appearing in the specification, which is improper." (internal citation omitted)).

20

Whether Kayak's system "acquir[es] the required and available quote information from the vendor's product database using predistributed software" is a disputed issue of fact—*i.e.*, whether or not Kayak's software is "predistributed"—and summary judgment is denied.[12]

### ii. Quotes

The parties stipulated that "quote" means "the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance." (Dkt. No. 131 at 8-9.) The parties also stipulated that "request for quote" means "a request for the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance." (*Id.*)

Kayak contends that these terms require two conditions: "(i) the price and other terms of a particular transaction in sufficient detail and (ii) that such terms are capable of acceptance—*i.e.*, the terms are irrevocably binding on the offeror." (Dkt. No. 139-17 at 4.)

Kayak argues that it does not provide quotes because the results it returns are not irrevocably binding. For example, the results are subject to availability. (Dkt. No. 139-17 at 5-6.) Kayak also argues that some of its results show prices that are inaccurate.[13] (*Id.* at 8-9.) Indeed, Kayak provides various disclaimers on its website noting that the listed prices might not be accurate 100% of the time and users should verify the details of any transaction on the provider's site. (DS ¶ 5; PR ¶ 5.) Kayak contends that these inaccuracies and disclaimers

---

[12] Neither party sought reconsideration nor clarification of the Court's claim construction ruling on this term. Yet, both parties now attempt to reargue claim construction. The Court has construed "obtaining . . . quotes," and the Court will not tolerate either party rearguing claim construction to the jury. Both parties must apply the Court's claim construction as written.

[13] The parties appear to agree that at least 91% of the results are accurate within $10. (Dkt. No. 155 at 6; Dkt. No. 139-17 at 8-9.)

demonstrate that it does not infringe because the responses it provides are not irrevocably binding.

In response, SST argues that Kayak's interpretation of the agreed upon claim construction is wrong. (Dkt. No. 155 at 4.) SST argues that a "quote" need not be binding. To support this interpretation, SST notes that Figure 8 of the patent shows an example of a returned quote that states the quote is "Subject to Prior Sale." ('328 patent at Fig. 8.) In addition, "the '328 patent arguably envisions conditions, such as credit verification, that must still be satisfied before a transaction is complete." *Source Search Technologies, LLC v. LendingTree, LLC*, 588 F.3d 1063, 1075 (Fed. Cir. 2009). On the other hand, Figure 8 also contains an option to "Accept" or "Reject" the quote. ('328 patent at Fig. 8.) SST maintains that Kayak's system returns all the material terms of an offer capable of acceptance in its results. SST also argues that there is evidence that a user can purchase a flight from Kayak's website without going directly to the provider's website. (Dkt. No. 155 at 6.) SST claims that all the system must do is verify that the seat is still available at the stated price. (*Id.* (citing Ex. C at 86-93).)

In *LendingTree*, the district court construed "request for a quotation" in the '328 patent to mean "a request for the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance." The Federal Circuit found that it therefore intended "quote" to mean "price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance." *LendingTree*, 588 F.3d at 1071. These are the constructions agreed to by the parties in this case.

In *LendingTree*, the Federal Circuit found that an offer must be capable of acceptance to qualify as a "quote."[14] Under the Federal Circuit's construction, a party may not renegotiate after such an offer is accepted. *See LendingTree*, 588 F.3d at 1072, 1074-75. This is precisely what SST argued to the Federal Circuit in the *LendingTree* matter. SST is bound by the positions it has consistently taken that a "quote" means an offer with such particularity that it can be accepted by clicking on a virtual "accept" button, or its equivalent.[15] SST cannot reverse

---

[14] Even if the Federal Circuit had not adopted SST's position on appeal—which it did—the Court would find that SST is estopped from arguing that a quote need not be capable of acceptance in light of its many statements to the district court, the Federal Circuit, and the USPTO stating that such capability is part of the invention claimed in the '328 patent. SST's assertion that the Federal Circuit rejected a construction that required the ability to "accept" quotes is wrong. Indeed, the Federal Circuit *vacated* the district court's grant of summary judgment of infringement with respect to LendingTree's website.

[15]    SST consistently advocated for this position during the *LendingTree* district court matter and during the *LendingTree* appeal. During the appeal, SST argued:

> The second problem addressed by claim 14 is that early e-commerce systems searched through online vendor catalogs to find product names and prices, using whatever databases were available. After locating vendors that stocked the item, a consumer would then select one from a list, and separately contact the vendor . . . . The vendor might reject or accept the order, based upon whether he could meet the terms of it. *Hence, a consumer might review the responses and "accept" one of them, only to find out later that the consumer's request to purchase the product was rejected* . . . . The '328 invention contacts the sub-subset of vendors and returns "the price and other terms of a particular transaction in sufficient detail to constitute <u>an offer capable of acceptance</u>." . . . Because the vendor computers are so tightly integrated and standardized with the e-commerce system, *what comes back are <u>all the detailed terms of a full contractual offer that can be accepted</u> with a "click,"* thereby solving this second problem.

(Dkt. No. 160-1, Ex. A, SST Appeal Brief at 11-12 (underlining in original, other emphasis added); *see also id.* at 21-22 ("The '328 patent quote includes specific shipping terms and charges, tax, conditions of quote, etc., *and an option to accept the offer to actually form a contract*." (emphasis added)); *id.* at 3 ("[I]n the '328 patent, *the returned quotes* contain <u>all</u> <u>contractually material terms</u> of the proposed transaction, and *can be accepted by the potential*

course now.  It strategically argued that the ability to accept an offer was what "quote" meant to

distinguish itself from the enormous breadth of internet searches that return information, often

very detailed information, but are not "quotes."   To have argued otherwise would have

endangered the validity of the patent.  Having overturned a finding of invalidity by a prior

district court in the *LendingTree* case by arguing for a narrower scope and definition, SST cannot

now be a chameleon.

   The fact that a condition may be placed on a response does not automatically prevent the

response from being "quote."  The nature of the condition is key.  If the sole condition is prior

sale, or seat availability at the price quoted, such a condition included in a response does not

automatically mean that such a response is not a "quote" as that term is used in the '328 patent,

because the response can be accepted and contains all material terms, and could be a binding

contract if the seat is available at that price point.  *See LendingTree*, 588 F.3d at 1074-75; *see*

---

*buyer to facilitate an on-line purchase*." (underlining in original, other emphasis added).)  SST
argued that the claimed invention required an actual offer, while in the prior art, a vendor was
free to accept or reject a buyer's order. (*Id.* at 21-22.)
   SST also took this position in the district court litigation in *LendingTree*, and it was
adopted by that court. *See Source Search Technologies, LLC v. Lending Tree, LLC*, Civ. No. 04-
4420, 2006 WL 2990363, at *9 (D.N.J. Oct. 16, 2006).  This position is exemplified by SST's
*Markman* brief in the *LendingTree* matter in front of District Judge Debevoise. (JA 1873, SST's
*Markman* Brief in *LendingTree* ("But, most importantly of all, the quote contains *a field for the
user to accept it by simply clicking on his computer to issue a firm purchase order for the
product*. Fig. 8.  (ACCEPT/REJECT QUOTE:). . .  when a quote is in such a detailed form so
that it can be accepted, it is generally interpreted to mean an offer, not a mere statement of
price." (emphasis in original).)
   SST made the same argument to the USPTO. (JA 1664 ("[T]he '328 patent explains that
the potential buyer can purchase the item by accepting the quote, which would not be possible if
there were a variety of additional terms . . . not included in the quote and which were unknown to
the buyer.").)

*also* '328 patent at Fig. 8 (noting the quote is subject to prior sale).[16]  Figure 8 is reproduced below:

```
                          PRICE  QUOTATION
RFQ DATE: 07/02/1993                    TRACKING NO : 1016
PROD. TYPE NO. : 12432                  ROUTING TO : NEW JERSEY
PROD. CATEGORY : RESISTORS              PROD. CODE : 4800
PRODUCT NAME  : TYPE J RESISTOR 5%
PRODUCT NUMBER : OHOO6-2000656
MANUFACTURER : OHMITE
QUANTITY      : 5,000     PIECES        DELIVERY DATE : 08/01/1993
NOTES : DELIVERY DATE IS FIRM.

QUOTE DATE : 07/03/1993 VENDOR NO. : 456546
VENDOR NAME : ACME RESISTOR SUPPLY, INC.
CONTACT     : JOHN MURRAY                    UNIT PRICE :     0.28
VENDOR PHONE : 515 222-3333         5,000 PIECE      = 1,400.00
VENDOR FAX  : 515 222-3056               SALES TAX :      0.00
CAN SHIP BY : 07/03/1993                 UPS GROUND :     26.00
                                              =  ========
                                                   1,426.00

VENDOR NOTES : SHIPPED 1000 PER BOX FROM INVENTORY, SUBJECT TO PRIOR SALE.
ACCEPT/REJECT QUOTE :
```

## *FIG. 8*

('328 patent at Fig. 8.)  However, providing information about pricing and inventory availability from a third party and requiring further negotiations and consummation with the third party at a later time for acceptance, does not constitute an offer capable of acceptance on Kayak's system.

Based on the discussion and analysis above, the Court finds that a "quote," as construed in this patent, must contain the "price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance" such that the price and other terms do not subsequently change and the act of clicking on a virtual "accept" button forms a binding contract.  This conclusion is based upon the parties' agreement as to the construction of this term, the Federal Circuit's analysis in *LendingTree*, and SST's prior representations to the USPTO and various courts as set forth in footnote 15 above.  Thus, if Kayak returns a search

---

[16] While the '328 patent mentions another condition—credit verification—in conjunction with credit purchases that condition payment on confirmation of delivery and acceptance by the buyer ('328 patent at 6:12-23), that issue being at the heart of the *LendingTree* matter, it is not apposite here.

result to a user that the user can "accept" at the terms and conditions stated by Kayak without further change to create a binding contract, there may be infringement as to that transaction, subject to trial on the other issues in this case, *e.g.*, other limitations, invalidity, prior art, *etc.*[17] However, if the "price and terms" response from Kayak is insufficient to form a binding contract at that price and upon those terms such that a user cannot simply click "accept," or its equivalent, to obtain a binding contract, that search query and response by Kayak does not infringe. As to such website interactions on the Kayak site, summary judgment of non-infringement is granted.

Thus, there is some portion of Kayak's website system that has been adjudged not to infringe the '328 patent, without the need for a trial as to the remaining disputed issues. As to that portion of Kayak's system that falls outside the principle upon which summary judgment is granted, there are facts in dispute as to whether they infringe, or not, based on all the other disputed issues in the case including, without limitation, the "quotes" limitation and other claim terms, validity, and infringement. Those instances of alleged infringement and validity will be tried to a jury.

It will be necessary to quantify that portion of Kayak's system that has been adjudged non-infringing as a matter of summary judgment, so that only the remaining portion of the system will be tried to a jury and subject to potential damages. This is necessary for efficient case management. Because this ruling requires quantitative and possible website sampling analysis, the Court wishes to give the parties the opportunity to engage experts as necessary. Therefore the Court's order will include the following:

    1. The parties will be given time to engage experts to apply the principle stated above to Kayak's system and perform a statistical analysis of Kayak's system to determine quantitatively how much of Kayak's search results fall within the

---

[17] As noted above, the offer can be subject to a condition of availability.

26

Court's summary judgment ruling. The experts may also identify how much of Kayak's revenue is attributable to potentially infringing acts compared to those acts that fall within the Court's grant of summary judgment of non-infringement. Within **70 days** of this Opinion, the parties shall exchange these expert reports. Within **90 days** of this Opinion, the parties shall schedule and take depositions of these experts. If further time is needed, the Court will be flexible with this schedule.

2. The parties will file a joint status report within **100 days** of this Opinion informing the Court of their progress.

3. After the parties file their status report, the Court will provide the parties with further instructions and send this matter to a special master. The parties will submit evidence to the special master and brief their positions. The special master will then identify the portion of Kayak's results that fall within the Court's summary judgment of non-infringement ruling. The remaining portions that are in material dispute will be decided by a jury. The special master will issue a report and recommendation to this Court with findings.

This procedure is necessary to separate out those results that do not infringe as a matter of law (*i.e.*, those results that meet principle stated above) from those results that may infringe. This process will allow the parties to present evidence regarding Kayak's system to the jury that is directed and scaled only to those transactions as to which infringement is in dispute. This procedure is also necessary to ensure that this case is in a manageable form for trial.

For the transactions that do not fall into the principle stated above, there are disputed issues of fact as to whether Kayak's system returns "the price and other terms of a particular transaction in sufficient detail to constitute an offer capable of acceptance." *E.g.*, SST alleges that a user can purchase a flight with all necessary terms through Kayak, which is only subject to a prior sale condition (*i.e.*, confirmation that the seat is still available). (Dkt. No. 155 at 6 (citing Ex. C at 86-93).)

In accordance with the discussion above, the Court grants-in-part and denies-in-part Kayak's motion for summary judgment of no infringement.

27

## IV.    CONCLUSION

For the reasons discussed above, the Court denies Kayak's motion for summary judgment regarding damages, denies Kayak's motion for summary judgment regarding invalidity, and grants-in-part and denies-in-part Kayak's motion for summary judgment regarding non-infringement.  An appropriate Order will issue.

**IT IS SO ORDERED.**

**/s/ Faith S. Hochberg_____**
**Hon. Faith S. Hochberg, U.S.D.J.**

28