UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

SOURCE SEARCH TECHNOLOGIES,
LLC,

          Plaintiff,

     v.

KAYAK SOFTWARE CORPORATION,

         Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 11-3388
(JEI/KMW)

**OPINION**

**APPEARANCES:**

KAPLAN BREYER SCHWARZ & OTTESEN, LLP
By:  Jeffrey I. Kaplan
    Daniel Basov (pro hac vice)
100 Matawan Road
Matawan, NJ 07747
       Counsel for Plaintiff


K&L GATES LLP
By:  Rosemary Alito, Esq.
    C. Bryan Cantrell, Esq.
One Newark Center, Tenth Floor
Newark, NJ 07102

By:  John J. Cotter, Esq. (pro hac vice)
State Street Financial Center
One Lincoln Street
Boston, MA 02111-2950
       Counsel for Defendant


**IRENAS,** Senior United States District Judge:

    Plaintiff Source Search Technologies, LLC ("SST" or

"Plaintiff") brought this action against Defendant Kayak

Software Corporation ("Kayak" or "Defendant") alleging

infringement of U.S. Patent No. 5,758,328 ("the '328 Patent"), which is titled "Computerized Quotation System and Method."

Pending before the Court is Defendant's motion for summary judgment of invalidity on the relevant patent claims for failure to claim patent-eligible subject matter under 35 U.S.C. § 101.

For the reasons stated herein, the motion will be **GRANTED**.

## I.

The '328 Patent, issued initially in May 1998 and subsequently reexamined, describes a computerized system and method for processing requests for quotations ("RFQs") between buyers and sellers over a computer network.[1]

In general terms, the '328 Patent presents an alternative to prior computerized systems for obtaining quote information from vendors, which, as SST explains in its specifications and communications with the Patent Office, utilized cumbersome centralized databases.  Relevant to the instant case are independent method claims 12 and 20 of the '328 Patent, which SST alleges Kayak infringes.

Claim 12 recites as follows:

A method of purchasing goods or services over a data
network comprising the steps of:

---

[1] The '328 Patent went through reexamination following a request from the Patent Office on August 11, 2011.  During reexamination, several of the patent's claims were cancelled, added, or modified.  This case concerns the claims in the reexamination certificate for the patent issued on March 21, 2013.  (Reexamined '328 Patent, Ex. B to Kayak's MSJ)

> communicating, over said data network, to a filter
> means, at least one request for a quotation from
> a potential buyer of said goods or services;
> filtering, at said filter means, the at least one
> request for quotation in order to ascertain a
> set of sellers potentially capable of supplying
> said goods or services; and
> obtaining, from at least one of said potential
> sellers previously ascertained by said filtering
> said request for quotation, over a data network,
> quotes to supply said goods or services, and
> forwarding said quotes to said potential buyer,
> wherein at least part of the quote information
> is stored at a location remote from said filter
> means.

(Reexamined '328 Patent, Ex. A to Kayak's MSJ)  Claim 20, which

is almost identical to claim 12, recites:

> A method of purchasing goods or services over a data
> network comprising the steps of:
> communicating, over said data network, to a filter
> means, at least one request for a quotation from
> a potential buyer of said goods or services;
> filtering, at said filter means, the at least one
> request for quotation in order to ascertain a
> set of sellers potentially capable of supplying
> said goods or services; and
> obtaining, by said filter means, responsive to said
> filtering, from at least one of said potential
> sellers, over a data network, quotes to supply
> said goods or services, and forwarding said
> quotes to said potential buyer, wherein at least
> part of the quote information is stored at a
> location remote from said filter means.

(Id.)[2]

On January 27, 2014, the Court issued a claim construction

opinion and order construing disputed terms used in both claims.

*Source Search Techs., LLC v. Kayak Software Corp.*, No. 11-3388

---

[2] Since there is no material difference between these claims, the Court will
apply the same analysis to both.

(FSH), 2014 Markman 314665 (D.N.J. Jan. 27, 2014) (hereinafter *Markman* Opinion"). The Court construed "filter means" to require "software for (1) selecting a class of vendors who sell the requested item(s), and (2) applying or comparing specified conditions to an item(s) of information to determine if the condition is met or not by the item(s) of information." *Id.* at *5-6. The Court also construed the "obtaining . . . quotes" step to require "the system acquiring the required and available quote information from the vendor's product database using pre-distributed software." *Id.* at *17-18.

The '328 Patent does not detail how this "predistributed software" functions. In construing claim 4 of the patent, which contains similar language to claims 12 and 20 regarding how the patent's system "generates" quotes from information in the vendors' databases, the Court noted that the patent's specifications mention the use of "suitable software" to acquire RFQ information from vendors, but give no structure to such software. *Id.* at *11.

The Court has already entertained one motion for summary judgment filed by Kayak with respect to damages, invalidity, and infringement, which the Court denied in part and granted in part.[3] (June 16, 2014, Opinion, Dkt. No. 199). Following the

---

[3] The Court granted Kayak's motion for summary judgment of no infringement to the extent the "price and terms" results Kayak's system generates are insufficient to form a binding contract. (June 16, 2014, Opinion at 26) The

4

Supreme Court's recent decision in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), decided just a few days after this Court's summary judgment decision, Kayak sought leave to file another motion for summary judgment on the grounds that the '328 Patent is ineligible for protection under § 101 because the claims are directed to an abstract idea.  The Court granted Kayak's request (Dkt. No. 236) and Kayak subsequently filed the instant motion on December 29, 2014.  SST filed an opposition and the parties have since submitted numerous letters informing the Court of recently decided cases in this quickly evolving area of the law.  The Court held oral argument on June 30, 2015.

## II.

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted if "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding a motion for summary judgment, the court must construe all facts and

---

parties thereafter engaged experts and submitted evidence to a special master, who issued a report and recommendation identifying the portion of Kayak's search results that fall within the non-infringement ruling.  Both parties have since filed motions objecting to the special master's report and recommendation.  (Dkt Nos. 259 & 260)

inferences in the light most favorable to the nonmoving party. *See Boyle v. Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 252.

The nonmoving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).  The court's role in deciding the merits of a summary judgment motion is to determine whether there is a genuine issue for trial, not to determine the credibility of the evidence or the truth of the matter. *Id.* at 249.

## III.

It is well established that a patent's subject matter eligibility under § 101 of the Patent Act is a question of law. *In re Comiskey*, 554 F.3d 967, 975 (Fed. Cir. 2009).  Section 101

provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court "has long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice*, 134 S. Ct. at 2354. This exclusionary principle stems from an underlying concern of pre-emption – that a patent might effectively grant a monopoly over an abstract idea and impede innovation. *Id*.

However, "an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id*. When a patent applies an abstract idea "to a new and useful end," it remains eligible for protection. *Id*.

The Supreme Court has delineated a two-step framework for distinguishing patents that claim an abstract idea from those that claim patent-eligible applications of an otherwise abstract concept.[4] *Id*. at 2355 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012)). First, a court must "determine whether the claims at issue are directed to a patent-ineligible concept," i.e. an abstract idea. *Id*. at 2355.

---

[4] The Court will refer to this framework as the *Alice/Mayo* test or the § 101 analysis.

If a court answers that question in the affirmative, it must then ask "[w]hat else is there in the claims before us?" *Id.* This step "examine[s] the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 2357 (quoting *Mayo*, 132 S. Ct. at 1294). Courts must "consider the elements of each claim both individually and 'as an ordered combination.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1298).

### A. Abstract Idea

Kayak argues, and SST concedes, that the '328 Patent's claims are directed to an abstract concept, specifically "obtaining quotes from selected vendors." (SST Opp. at 1)  The Court agrees.

While the Supreme Court has not established the "precise contours" of the abstract ideas category, it has held "fundamental economic practice[s] long prevalent in our system of commerce" to be abstract.  *Alice*, 134 S. Ct. at 2355-56. Such fundamental economic practices have included "hedging financial risk," *Bilski v. Kappos*, 561 U.S. 593 (2010), and "intermediated settlement," *Alice*, 134 S. Ct. at 2356.

Here, the concept of obtaining quotes for goods and services from selected vendors embodied within the '328 Patent's claims falls squarely within the fundamental economic practices

8

held to be abstract ideas.  Having found the '328 Patent to be

directed towards an abstract concept, the Court now turns to the

second step in the *Alice/Mayo* test – whether the '328 Patent

includes an "inventive concept" that transforms the otherwise

abstract concept into a patent-eligible invention.

### B. Inventive Concept

Kayak argues that the '328 Patent, in bypassing the need

for a centralized database and obtaining RFQ information from

vendor databases directly, acts no different than an agent

calling up a vendor and asking for such information.  Further,

Kayak states that patent utilizes conventional software to

accomplish this task.  Since claims 12 and 20 simply describe a

method for implementing that well-worn business practice on a

computer network using generic computer technology, Kayak

asserts that the '328 Patent fails to add significantly more to

the otherwise abstract idea of obtaining quotes from vendors and

cannot be eligible for protection under § 101.

In its opposition, SST cites only one aspect of the '328

patent's claims 12 and 20 that transforms the abstract idea of

obtaining quotes from select vendors into a patent-eligible

invention.  Specifically, based on the Court's prior claim

construction, SST points to how the '328 Patent "obtains . . .

quotes" by "acquiring the required and available quote

information from the vendor's product database using

9

predistributed software."  Since SST does not rely on any other
feature of the claims, the Court will focus its analysis on the
predistributed software issue.

In searching for an inventive concept, courts "consider the
elements of each claim both individually and as an ordered
combination to determine whether the additional elements
transform the nature of the claim into a patent-eligible
application."  *Alice*, 134 S. Ct. at 2355.  The inventive concept
must "ensure that the patent in practice amounts to
significantly more than a patent upon the [abstract idea]
itself."  *Id*.  This requires more than "simply stat[ing] the
[abstract idea] while adding the words 'apply it.'"  *Id*. at 2357
(quoting *Mayo*, 132 S. Ct. at 1294).  The claims must include
"additional features" beyond "well-understood, routine,
conventional activity."  *Ultramercial, Inc. v. Hulu, LLC*, 772
F.3d 709, 715 (Fed. Cir. 2014) (quoting *Mayo*, 132 S. Ct. at
1298).

*Alice* makes clear that limiting the use of an abstract idea
to a particular technological environment, such as a computer
network, will not suffice.  134 S. Ct. at 2358.  "Given the
ubiquity of computers, wholly generic computer implementation is
not generally the sort of additional feature that provides any
practical assurance that the process is more than a drafting
effort designed to monopolize the abstract idea itself."  *Id*.

Recent Federal Circuit cases have since applied the *Alice/Mayo* framework to hold known business practices applied using generic computer technology and programming ineligible for protection.  See *buySAFE v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014) (finding no inventive concept when claims recited the use of generic computer functions – sending and receiving information over a network – to apply the abstract idea of "transaction performance guarantees" to the internet);, *Ultramercial*, 772 F.3d at 716 (finding that a patent drawn to using an advertisement as an exchange or currency over the internet merely narrowed an otherwise abstract idea to a particular technological environment, which could not save the claim); *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343 (Fed. Cir. 2014) (finding a method of extracting data from hard copy documents using an automated digitizing unit such as a scanner, recognizing specific information in that data, and storing that information in memory (a method that could be used in an ATM that recognizes information on a scanned check) to be directed to the abstract idea of data collection, recognition, and storage, and holding that the use of admittedly generic scanning and processing technologies to perform these conventional activities did not constitute an inventive concept).

On the other hand, the Federal Circuit has found a patent to be eligible for protection under § 101 where the claims did not merely recite the performance of a known business practice and apply it to the internet, but provided a solution "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).  The patent in *DDR Holdings* described a system for generating a composite web page when a user clicked on a third-party merchant's advertisement (i.e. a "hyperlink") that combined the visual elements of the "host" website with the content of the third-party merchant.  *Id.* at 1248.  In upholding patent eligibility, the court found that the claims addressed a challenge particular to the internet – that hyperlinks automatically transferred users away from the host page – and offered an "inventive concept for resolving this particular Internet-centric problem."  *Id.* at 1259.  The court cautioned, however, that "not all claims purporting to address Internet-centric challenges are eligible for patent."  *Id.* at 1258.  The *DDR Holdings* patent qualified for § 101 protection because it "specif[ied] how interactions with the Internet are manipulated to yield a desired result – a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink."  *Id.*  Significantly, the Federal Circuit

12

did not reach a decision as to whether the patent at issue was directed to an abstract idea, but noted the difficulty in translating the problem and solution stated in the claims to the brick and mortar context.

SST makes two primary arguments in favor of finding that the method described in claims 12 and 20 add enough to the '328 Patent's otherwise abstract concept so as to find the patent eligible for protection under § 101.  First, SST stresses that the Patent Office distinguished the '328 Patent from prior arts similarly directed towards soliciting quotes from vendors using computer technology.  Since there are other non-infringing computer-based methods for obtaining quotes from vendors that do not use "predistributed software," SST claims the '328 Patent overcomes the pre-emption issue underlying the *Alice* framework.  Second, SST argues that the use of predistributed software solves database maintenance and interface problems particular to computer systems, which satisfies § 101 under *DDR Holdings*.

### 1. Preemption

SST focuses much of its opposition on the argument that the '328 Patent does not pre-empt other computerized methods for obtaining quotes from selected vendors and, since the pre-emption issue underpins the § 101 analysis, the Court must find the '328 Patent to be sufficiently limited enough so as to satisfy step two of the *Alice/Mayo* test.  The Court disagrees.

While SST is certainly correct that § 101 does not protect abstract ideas in large part due to the concern that such patents will grant monopolies over ideas that form the backbone of human ingenuity, it does not necessarily follow that the '328 Patent would be ineligible under § 101 only if its claims "preclude substantially all the potential methods of computerizing 'obtaining quotes from select vendors.'" (SST Opp. at 9) *See Money Suite Co. v. 21st Century Ins. and Fin. Servs., Inc.*, No. 13-984-GMS, 2015 WL 436160, at *5 (D. Del. Jan. 27, 2015) ("[A]lthough courts have framed the 'second-step' analysis [from *Alice*] in terms of preemption, there is no rule that ideas that do not preempt an entire field are *per se* patent eligible."); *Open Text S.A. v. Box, Inc.*, No. 13-cv-4910-JD, 2015 WL 269036, at *4 (N.D. Cal. Jan. 20, 2015) ("[W]hile preemption concerns may be the root of the Supreme Court's section 101 test, it does not follow that the Court determines patentability by guessing at the probability of preemption. There is no non-speculative way for a court to determine whether and to what extent future innovation might be curtailed.").

Money Suit is particularly informative on this point.  In that case, the court found the claims at issue to be directed towards the abstract concept of generating price quotes for financial products.  *Money Suite*, 2015 WL 436160, at *3. Plaintiff argued that the patent's use of front-end network

14

gateways to obtain quote information left open other computer-implemented systems for generating quotes that did not use front-end network gates, and therefore sufficiently allayed the preemption concern underlying the § 101 analysis.  Rejecting this assertion, the court found that "[t]he availability of other possible computer-implemented methods . . . does not assuage fears of blocking further innovation." *Id*. at * 5.

That there are other methods for obtaining quotes which would not infringe on SST's patent, even other computer-based methods, does not mean that the '328 Patent's claims automatically satisfy the § 101 analysis.  *See OIP Techs., Inc. v. Amazon.com, Inc.*, No. 2012-1696, 2015 WL 3622181, at *4 (Fed. Cir. June 11, 2015) ("[T]hat the claims [directed to the concept of offer-based price optimization] do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make them any less abstract."); *Kroy IP Holdings, LLC v. Safeway, Inc.*, No. 2:12-cv-800-WCB, No. 2015 WL 3452469, at *15 (E.D. Tex. May 29, 2015) ("The Supreme Court has made it clear that the fact that claims are directed to a specific commercial application of an abstract idea does not by itself render them patentable.")  As stated above, the existence of some limitation will not save an otherwise abstract concept;

15

the § 101 analysis requires the Court to determine whether that limitation constitutes a specific, unconventional step.[5]

In making its pre-emption argument, SST stresses again and again that the United States Patent Office issued the '328 Patent over prior arts directed to other computerized implementations of the same abstract idea of soliciting quotes from vendors.  According to SST, that the Patent Office allowed the '328 Patent based on the predistributed software step as a new limitation means this step must also limit the abstract idea so as to pass muster under the § 101 analysis.  But the Patent Office's decisions do not dictate this Court's application of the *Alice/Mayo* test; such reasoning would eviscerate the § 101 analysis the Supreme Court has directed district courts to perform.  Under SST's logic, if the Patent Office issues a patent over prior art based on some additional element, the patent necessarily satisfies *Alice/Mayo* step two.  But SST conflates the § 102 novelty analysis and the § 101 patentable subject matter issue.[6]  "The 'novelty' of any element or steps in

---

[5] Of course, this does not mean that the Court does not consider the preemption concern, which is "already baked into the *Mayo/Alice* test." *Open Text S.A.*, 2015 WL 269036, at *4.

[6] The Southern District of New York recently rejected a very similar argument in *Intellectual Ventures II, LLC v. JP Morgan Chase & Co.*, No. 13-cv-3777 (AKH), 2015 WL 1941331 (S.D.N.Y. Apr. 28, 2015).  Plaintiff in that case stated that there was no preemption concern associated with the patent at issue, which claimed a method for filtering packetized information received by a network's firewall, because the patent "distinguishe[d] its claimed method from the filtering methods covered by the prior art" and did not "cover all methods of filtering computer network packets." *Id.* at *9.  The court found this to be "merely a claim of alleged novelty." *Id.*

16

a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Diamond v. Diehr*, 450 U.S. 1048, 1058 (1981). *See also IpLearn, LLC v. K12 Inc.*, No. 11-1026-RGA, 2014 WL 7206380, at *6 (D. Del. Dec. 17, 2014) ("A new idea, *i.e.*, one that is non-anticipated and non-obvious, does not, however, make an abstract idea patent eligible."). The question is whether the predistributed software requirement qualifies as an inventive concept, not merely a novel one. To that end, the Court turns to SST's argument that this case falls under the Federal Circuit's decision in *DDR Holdings*.

### 2. *DDR Holdings*

SST attempts to analogize this case to *DDR Holdings* by arguing that the '328 Patent presents technological solutions to problems specifically arising in the realm of computer networks, namely database management and computer interface issues, and therefore includes an inventive concept necessary for § 101 eligibility. The Court finds *DDR Holdings* to be inapposite.

*DDR Holdings* acknowledged the difficulty in drawing a line between patent-eligible and patent-ineligible applications of abstract ideas, and has spawned a flood of district court opinions attempting to delimit the scope of the Federal Circuit's decision. While the area remains somewhat muddled,

district courts have derived certain helpful principles.  As stated above, *DDR Holdings* found a patent eligible for protection where it provided a solution "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings*, 773 F.3d at 1257.  When determining whether a patent solves a problem "specifically arising in the realm of computer networks," courts have looked to whether the invention of the internet or certain computer technology created the problem at hand.  *See, e.g., Market Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957, 2015 WL 3637740, at *12 (N.D. Ill. June 11, 2015) (noting that the *DDR Holdings* patent was "an inventive solution to a peculiar problem encountered on the Internet").  If the court can point to a brick and mortar analog to the problem at issue, the computerized solution will not suffice to make the patent eligible under § 101.

In determining whether technology created the relevant problem, courts look to whether the claims at issue override some conventional sequence of events taking place within a particular technological environment.  *See Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, No. 14-732-RGA, 2015 WL 1744343 (D. Del. Apr. 15, 2015).  The claims in *Messaging Gateway* specified how "an interaction between a mobile phone and a computer is manipulated" in order to allow phones to send SMS

messages to computers.  *Id.* at *5.  Conventionally, such an interaction could not occur.  *Id.*  But the claims overrode that conventional practice by translating the message in a way that allowed the computer to receive and understand the message.  *Id.*  The court highlighted that the claims provided a solution "tethered to the technology that created the problem."  *Id.*

Merely improving speed and efficiency through implementation over the internet or computers does not root problem and solution in computer technology.  *See Jericho Sys. Corp. v. Axiomatics, Inc.,* No. 3:14-CV-2281-K, 2015 WL 2165931, at *5-6 (N.D. Tex. May 7, 2015).  Courts look to whether a human being could perform the same steps, albeit at a slower pace.  *See Kroy*, 2015 WL 3452469, at *13 (finding that claims drawn to a system and method for providing incentive award programs over a computer system did not "improve" computer technology like the claims in *DDR Holdings* because "each of the functions that the '830 patent assigns to computers could be performed by a human being without the aid of a computer of any kind").

On the other hand, *DDR Holdings* has applied where a patent improved a particular aspect of computer technology.  *See Trading Techs. Intn'l, Inc. v. CQG, Inc.,* No. 05-cv-4811, 2015 WL 774655 (N.D. Ill. Feb. 24, 2015).  The patents in *Trading Technologies* concerned market information (bid and ask prices) displayed on "graphical user interface devices" ("GUIs") used

for "click-based" trading. *Id*. at *1-4. "There was a risk with the prior art GUIs that a trader would miss her intended price as a result of prices changing from under her pointer [based on updates from the market] at the time she clicked the price cell on the GUI." *Id*. at *4. The patents at issue specified a GUI device that displayed a "static price axis," which eliminated that prior technical problem and allowed traders "the ability to more efficiently and accurately place trades on electronic trading systems." *Id*. at *5. While the court held the patent was not directed to an abstract idea in the first place, it also found that the "static price axis" was a sufficient inventive concept in line with *DDR Holdings*. *Id*.

In aligning the instant case to *DDR Holdings*, in which the Federal Circuit did not find the patent at issue to be directed to an abstract idea, SST argues that the "claims at issue are directed entirely to solving a database management and computer interface problems [sic] specific to the realm of computer networks." (4/22/2015 SST Ltr. in Support of Opp., Dkt. No. 266) The Court finds this statement somewhat disingenuous. The '328 Patent is clearly directed to an efficient system and method of obtaining quotes from select vendors, a business practice known from the pre-Internet world. One need not look further than the "Background of Invention" section of the specifications:

> Buyers in need of goods and services often spend considerable time locating an appropriate vendor. Buyers use trade publications, directories, recommendations, and other means to locate vendors . . . . Once a buyer identifies a few vendors, each must be contacted to obtain product or service price and availability information. *This is a time consuming process and companies typically rely on experienced purchasing staff to accomplish it.*

(1:27-38 (emphasis added))

What differentiates the '328 Patent from the prior art, and helps to eliminate this "time consuming process" indeed concerns an issue with centralized databases.  But SST cannot set aside the ultimate direction of the patent, a clearly well-worn business practice, in order to align its case with *DDR Holdings*.

Of course, this does not end the conversation. *DDR Holdings* leaves room for patents that do not *merely* recite some known business practice if the system or method by which the patent happens to implement that idea also solves a problem specifically arising in the realm of computer networks in a way that roots the patent in computer technology.  See *Messaging Gateway*, 2015 WL 1744343, at *5 (finding a method for facilitating communication between a mobile device and a computer to be directed to the abstract idea of "translation," but also directed to a problem unique to that particular technological environment and a solution tethered to that technology).  SST appears to claim that the '328 Patent solves

21

two distinct problems: database management and computer interface.

With regards to the former, the '328 Patent's step of predistributing software that will work to obtain RFQ information from vendor databases – as opposed to having vendors submit their own RFQ information to a centralized database – addresses the difficulty in keeping centralized database current and offering an unlimited array of goods and services in such a database.  But this does not solve a computer-centric problem like the hyperlink issue in *DDR Holdings*.  In that case, the Federal Circuit emphasized that the problem the patent at issue aimed to solve did not have a brick and mortar analog.  The challenge of retaining customers who might, by virtue of clicking on a hyperlink, be instantly transported to another website, was unique to the internet.  The same issue did not arise in the context of a "store within a store," as the dissent argued.  This fact led the court to find that the problem the patent meant to overcome arose in the realm of computer technology specifically.

The database management problem is not unique to the computer world.  The '328 Patent's specifications describe the problem with the prior art, which utilize centralized databases of vendor information, as follows:

22

The prior art describes computerized shopping systems which employ some kind of central database of goods and services offered to buyers.  Information about the goods and services offered is stored centrally and must be kept current centrally.  The volume of information required to be maintained and updated in a central database system restricts it to a limited type or number of goods and services or number of vendors it can offer. It is not feasible for such systems to provide access to all standard goods and services and all suppliers world wide.  For such a central database to exist, the amount of information to be stored would be awesome as would be the task of keeping it current.  It simply is not feasible for central database systems to satisfy the need of buyers to receive timely quotes on an enormous variety of goods and services from vendors anywhere in the world.  For this reason existing centralized database systems are create and maintained by the one or a few vendors whose goods and prices are displayed. These systems necessarily restrict a buyer's choice of vendors.

('328 Patent, col. 1, lines 42-60)

SST has been clear in its correspondence with the Patent Office that the '328 Patent works to solve this constraint associated with the prior art's use of centralized databases.  (See 8/11/2011 Response at 12, Joint Appx. at 1295, Dkt. No. 86 (quoting the above language from the specifications and stating "the '328 claims . . . at issue relate to a solution to the above mentioned problem")  Yet, unlike the hyperlink issue in *DDR Holdings*, the same "database management" issue addressed by the '328 Patent – that you cannot fit all quotes from all vendors into one central database – exists in the brick and mortar world.  A central database is analogous to a print

23

catalogue containing prices for goods or services, either from one vendor or a collection of vendors.

Just as the centralized database cannot contain all goods and services world-wide, no catalogue could contain such information.  Just as it would not be feasible to keep the centralized database current, it would be an awesome task to do so for catalogues.  Simply put, technology did not create the problems associated with storing quote information from numerous vendors in one location.  The Court therefore cannot find the "database management" problem as one "specifically arising in the realm of computer networks."  *DDR Holdings* does not apply in that regard.

Still, SST argues that the process by which the '328 patent interacts with vendor databases – through the predistributed software – resolves a separate "computer interface" issue particular to computer networks.  Kayak responds that the function of the predistributed software cannot be inventive under *Alice* because it merely mimics the role of an agent contacting vendors directly for quote information.  But communication between the '328 patent's central system and individual vendors' systems is not as simple as an agent's phone call to a vendor representative (or search through a vendor catalogue).  The central system needs to acquire particular quote information so that the individual who submitted the RFQ

24

can obtain an offer capable of acceptance.  "[T]he varying database types and formats [among vendors] would make it difficult to find the return policy, the shipping terms, the shipping times, etc. in each vendor database."  (SST Opp. at 5) According to SST, the central system "obtaining" quotes from vendor databases could not effectively communicate with vendor databases in order to retrieve particular RFQ information without the predistributed software.  This concern does not exist in the manual world.  SST argues that the predistributed software therefore constitutes an inventive concept in solving this computer-centric problem.

The Court agrees with Kayak that the overall function of the relevant claims analogizes to the function of an agent calling vendors' representatives or combing through vendor catalogues for quote information related to particular products and services.  However, in implementing this method over computer systems, a computer-centric problem indeed arises in how the central system acquiring quote information interfaces with varied vendor databases.  In *Messaging Gateway*, mentioned above, the court found a similar problem regarding a mobile phone's inherent inability to communicate with a computer to be unique to that particular technological environment and applied *DDR Holdings* in finding the solution to that problem to be an inventive concept.

Of course, the *Messaging Gateway* patent was entirely directed towards solving that translation issue.  That was its overall purpose.  In contrast, the '328 patent, in general, is directed towards a more efficient system for obtaining quotes than existing centralized databases, which, as stated above, does not solve a computer-centric problem.  It just so happens that in accomplishing this task an interface issue arises and a particular element of the claims addresses that interface issue.  It is unclear whether *DDR Holdings* requires that a patent's claims, at large, solve a problem arising in computer technology.  However, the Court recognizes that step two in the *Alice/Mayo* test instructs us to consider each element of the claims both *individually* and as an ordered combination.

Yet, even accepting that the '328 Patent addresses a computer-centric challenge in the interface between the central system and vendors' databases, *DDR Holdings* explicitly cautioned that not all claims purporting to address such challenges are eligible for patent.  *DDR Holdings*, 773 F.3d at 1258.  The patent in *DDR Holdings* was eligible for protection not only because it solved an internet-centric problem, but also because the method for doing so described in the patent's claims "*specif[ied] how* interactions with the Internet are manipulated to yield a desired result . . . that overrides the routine and conventional sequence of events ordinarily triggered by the

26

click of a hyperlink." *Id.* (emphasis added)  Specifically, the claims detail the sequence by which the claimed system directed users to a "hybrid" web page that keeps the "look and feel" of the host website rather than sending the user to a completely different third-party site.  *Id.*  This feature, which was neither a generic computer function nor a conventional network operation, qualified as an inventive concept.

District courts have emphasized this aspect of *DDR Holdings* when examining claims for an inventive concept.  In *Messaging Gateway*, the court found a patent that described a method for facilitating conversation between different electronic devices to be directed to the abstract idea of "translation," but eligible for protection because the claims "specifie[d] how an interaction between a mobile phone and a computer is manipulated in order to achieve a desired result which overrides conventional practice."  2015 WL 1744343, at *5.  The claims described the sequence by which SMS text messages are translated.  On the other hand, in *Intellectual Ventures II LLC v. JP Morgan Chase & Co.*, which considered a claimed method for filtering "packets" of information received by a computer network's firewall, the court held that the patent did not come under *DDR Holdings* and failed to add an inventive concept because the claims lacked specificity as to the operative technology.  2015 WL 1941331, at *11.  Whereas the patent in *DDR*

27

*Holdings* "recited specific steps to accomplish the desired result," the patent in *Intellectual Ventures II* "specifie[d] neither *how* the information in the packets is processed nor *how* an access rule is selected or implemented; just that the information *is* processed and the access rule *is* implemented") (emphasis in original). *Id. See also East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc.*, No. 12-cv-517-LM, 2015 WL 226084, at *9 (D.N.H. Jan. 15, 2015) ("[T]hat claim only says what the invention does. Without a disclosure of how the invention does what it does, neither the specification nor the claim identifies an inventive concept.").

Neither the '328 Patent's claims nor specifications go into any detail as to *how* the predistributed software works to facilitate communication between the central system and vendor databases, thereby eliminating the described interface problem. As the Court already noted in its *Markman* opinion, there is no stated structure to the software. The specifications state only, in varied ways, that suitable software will acquire RFQ information from vendor databases and communicate that information to the central system. There is no detail as to *how* the software accomplishes that task.[7]

---

[7] There is a secondary question of whether such software would also be generic and well-known at the time. SST's expert Dr. Pramod Prancha opined in an expert report submitted prior to the *Markman* hearing, that the software used to "interrogate" vendor databases in order to generate quote information – clearly the same "predistributed software" on which SST relies here – was

In its opposition, SST argues that "the issue is not whether one step of the claim includes specific software code or is generic." (SST Opp. at 20)  But to be an "inventive concept" – and SST claims the predistributed software to be just that – this feature of the claims cannot merely cite the use of generic software, or otherwise detail "well-understood, routine, or conventional activity" in the course of implementing the underlying abstract idea.  It must add "significantly more" so as to ensure that the claims do not merely patent the abstract idea itself.  Without specific detail as to how the predistributed software actually functions, and considering evidence from SST's own expert that such software was well known, the fact that the patent merely cites the use of software does not alone supply "significantly more" to the underlying abstract idea.

During oral argument, SST cited *Messaging Gateway* and *Trading Technologies* as cases that applied *DDR Holdings* to find patents eligible for protection even when the patents did not specify the software used to solve the relevant computer-centric problems.  But the claims in those cases went further than the

---

"well known and in wide use for many years before the 1996 filing date of the '328 Patent" and "it would be a very simple matter to write a small piece of code to pull the terms desired from the vendor database, assemble them into a data structure and form a quote from it." (Prancha Rpt. at ¶¶ 5-7, Ex. 1 to SST's Markman Brief, Dkt. No. 84-1)  The Court excluded Dr. Pracha's report from consideration with regards to the *Markman* hearing, but this description of the predistributed software is relevant in determining whether it constitutes some unconventional inventive concept.

bare recitation of "software" seen here.  In *Messaging Gateway*, the claims did not merely state the use of "software" to translate SMS text messages; they described, step by step, the sequence by which that translation occurs.[8]  Similarly, in *Trading Technologies*, the claims specified the use of a static price axis to display market depth on GUIs, not just the use of some unidentified "software" to accomplish that goal.  In addition, the patent at issue did not state an abstract idea in the first place and clearly improved an existing technological device – prior art GUIs – by adding the static price axis feature to the claimed method.

Here, the '328 patent does not detail how the predistributed software actually acquires quote information from vendor databases.  We know only that suitable software accomplishes that particular task.  Unlike the patent in *Messaging Gateway*, which detailed the steps taken to translate SMS text messages – the solution to a computer-centric problem – the '328 patent, as stated in the *Markman* opinion, identifies no such sequence by which the predistributed software obtains quote

---

[8] Note, in comparison, *TriPlay, Inc. v. WhatsApp Inc.*, in which a magistrate judge's pending report and recommendation to the same court finds a very similar patent whose claims are directed towards converting and forwarding electronic communications from one device to another to lack an inventive concept because the relevant claim does not specify how the conversion of messages actually functions and therefore fails to limit the claim to a specific way of converting messages.  No. 13-1703-LPS, 2015 WL 1927696, at *15 (D. Del. Apr. 28, 2015).  The report and recommendation explicitly distinguished *Messaging Gateway* as specifying a "particular *solution*."  *Id*.

information from vendor databases.  Neither do the '328 patent's claims go as far as the patent in *Trading Technologies* in detailing a particular improvement to existing technology.[9]

*DDR Holdings* tells us that when a patent holder seeking to establish § 101 eligibility for an otherwise abstract idea points to a particular element of a patent's claims as solving a computer-centric problem, the claims must specify how that solution works.  *That specificity removes the claims from the abstract realm.*  "[S]tating an abstract idea while adding the words 'apply it to a computer'" does not suffice for patent eligibility.  *Alice*, 134 S. Ct. at 2358.  Under the same reasoning, adding the words "apply it to a computer *using software*" with nothing more would not suffice either.  Finding a patent eligible for protection when the claims cite the use of "software" to solve a computer-centric problem without any further detail would hinge the § 101 analysis on the art of a particular draftsman.  SST acknowledged during oral argument that many different kinds of software could facilitate interface

_____

[9] SST's opposition also cites to *Ameranth, Inc. v. Genesis Gaming Solutions, Inc.*, No. SACV 11-00189 AG (RNBx), 2014 WL 7012391 (C.D. Cal. Nov. 12, 2014), and *Intellectual Ventures I LLC & Intellectual Ventures II LLC v. Mfrs. & Traders Trust Co.*, No. 13-1274-SLR, 2014 WL 7215193 (D. Del. Dec. 18, 2014), as further examples of patents found eligible for protection where the claims contained a step executed with software without specifying that software. Neither case applies here.  In *Ameranth*, the court did not even reach step two of the *Alice/Mayo* test in analyzing the relevant system claim.  In *Intellectual Ventures*, the relevant claim described a particular method for tailoring information delivered to an Internet user in order to address the problem of webpages normally appearing identical to each user.  The claim did not merely state the use of "software" to customize web pages.

between a central system and vendor databases.  The '328 patent, in avoiding specificity, would cover them all.  That is the kind of result the Supreme Court and Federal Circuit have sought to avoid.

The Court finds, as a matter of law, that claims 12 and 20 of the '328 patent fail add the inventive concept necessary to transform the otherwise abstract concept of obtaining quotes from select vendors into a patent-eligible invention.  There are no relevant disputes of fact to be resolved on the issue.  The Court will therefore grant Kayak's motion for summary judgment.

## IV.

For the reasons set forth above, the Court will **GRANT** Defendant's motion for summary judgment.  An appropriate order accompanies this opinion.


Date: July 1, 2015

                                    s/ Joseph E. Irenas          _
                              **Joseph E. Irenas, S.U.S.D.J.**